THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OLLIE BENNETT, Defendant-Appellant.

First District (5th Division)   No. 85—2569

Opinion filed March 27, 1987.

SULLIVAN, P.J., dissenting.

Steven Clark and Cheryl M. Berdelle, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Rimas F. Cernius, and John J. Hoevel, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LORENZ delivered the opinion of the court:

Defendant, Ollie Bennett, was charged by information with the offenses of armed robbery and armed violence. (Ill. Rev. Stat. 1983, ch. 38, pars. 18—2, 32A—2.) After a jury trial, he was found guilty of armed robbery and was sentenced to a penitentiary term of 10 years.

He appeals, contending that he was not proven guilty beyond a reasonable doubt of armed robbery because the description given by the complainant did not match his appearance and because there were no fingerprints obtained from the physical evidence which linked him to the crime. He also contends that he was denied his right to trial by a fair and impartial jury where the trial court, during the polling of the jurors, failed to examine a juror whose statement indicated possible dissent from the verdict and that he was denied a fair trial by the improper and prejudicial statements made by the prosecution during both stages of its closing argument.

The following facts were adduced at trial. At approximately 10

a.m. on November 16, 1983, the complainant, Carletta Blade, had just returned home from shopping at a grocery store. As she approached the third-floor landing where her apartment was located, she encountered defendant, who was pointing a .32—caliber handgun at her from three steps above. Defendant then demanded money, and in response complainant stated that she had none. A conversation between the two then took place. During that time, they stood face-to-face about 36 inches apart. About five minutes elapsed when defendant grabbed the complainant's purse, pushed her, and ran down the stairs.

After defendant had run away, the complainant went into her apartment and informed her husband and son of the armed robbery. They then got into her car and attempted to chase defendant. She subsequently spotted defendant as he was running down an alley near the intersection of Michigan Avenue and 120th Place, but she then lost sight of him. Immediately thereafter, complainant encountered a police officer. She described her assailant to the officer as a medium-complected black man, 5 feet 9 inches to 6 feet tall, who weighed 170 to 180 pounds and who had natural or curly hair and a thick mustache. She further stated that he was wearing blue jeans, a navy blue pea coat, and a dark skull cap. At the time Blade was robbed, defendant was not carrying a cane or crutches.

Approximately an hour and a half after the offense in question, the police received an anonymous telephone call from a woman who lived at 21 East 120th Place. The caller stated that earlier that morning she had observed a black man wearing a navy blue coat hide two bags in the bushes in the back of her yard. Subsequently, the same person returned wearing a gray coat and retrieved one of the bags. He then walked westbound on 120th Place.

Police officer Thomas McCann, responding to that tip, proceeded to 120th Place. There, he observed defendant and defendant's wife walking westbound on 120th Place. Defendant, who was wearing a gray coat, was stopped and arrested. It was later established that defendant and his wife lived at 12036 South Harvard, which is five blocks west of the location of the robbery. Officer McCann also stated that defendant's vehicle was found at 12147 South Indiana, which is less than one block west of the scene of the crime.

After defendant was arrested, defendant's wife told Officer McCann that defendant had dropped the paper bag which he had retrieved from the aforesaid location. Police officers conducted a search of that area and discovered a paper bag lying on the curb at 12015 South State Street. In that bag was a .32-caliber black snub-nosed

handgun. A subsequent gun registration check indicated that the gun had been reported missing by Arnold Zalon 11 months before the armed robbery in question.

Zalon testified that the gun had been stolen from the bathroom of his place of business and that, at that time, defendant's sanitation service was employed by him to clean his bathrooms. Zalon stated that at times two other employees besides defendant cleaned his bathrooms.

In addition to the aforesaid gun, Officer McCann testified he found the complainant's purse in a plastic grocery bag, hidden in the backyard bushes at 21 East 120th Place. Neither the purse nor the gun was dusted for fingerprints. Officer McCann further testified that at the time defendant was arrested, he did not appear to have any difficulty walking.

About three hours after the armed robbery, the complainant arrived at the police station. She first identified her purse and then viewed a lineup of four men which included defendant. All were black men who had mustaches; defendant was the tallest of the four. Detective Flood testified that the complainant positively identified defendant in the lineups he conducted as the man who had robbed her. Flood further testified that the complainant stated that she had observed the defendant once before in the neighborhood.

Defendant, testifying in his own behalf, stated that on the morning of the offense in question, he was on his way to work when he realized that he had car trouble. Because of that trouble, he immediately returned home and went back to bed. At 10:15 a.m. he and his wife walked to a liquor store at 120th and Michigan Avenue in order to pick up defendant's automobile from an acquaintance who was supposed to have fixed it. When they could not find that individual, they purchased a bottle of wine and proceeded to walk home. On the way to their home, they were suddenly surrounded by police. He was then arrested.

Defendant asserted that at the time he was arrested, his right knee was badly swollen because he suffered from gout and high blood pressure and he was using a walking stick because of that condition. Defendant further testified that he began complaining to the police about his gout condition as soon as they took his stick away. It was established that defendant received out-patient treatment for his gout condition at Cermak Hospital about two weeks after the crime. Defendant further admitted that he had been convicted of two Federal firearm violations in 1978 and 1982. On cross-examination, defendant further conceded that during the 17 months that he had

been appearing in court on the present matter, he had never appeared in a wheelchair, as he did at trial.

Following the close of evidence and closing arguments, the jury returned a verdict of guilty. The jury was then polled. The court told the jury that the clerk would call each juror's name and ask them to answer the question: "Was this and is this now your verdict?" The question was put to the jury as a group and each juror gave his or her response. Neither the court nor the clerk repeated the question for each subsequent juror after the previous juror gave his response. The following colloquy then occurred between the court and the fifth juror polled:

"[THE CLERK]: Smith.
[THE JUROR]: Smith, Not sure.
[THE COURT]: Pardon?
[JUROR SMITH]: I'm not sure.
[THE COURT]: Is this
[JUROR SMITH]: This is my verdict.
[THE COURT]: It is your verdict."

The trial judge made no further inquiries of juror Smith. All of the other jurors answered yes to the court's question. At the end of the polling, defense counsel asked the court to declare a mistrial based upon the fifth juror's statement that she was "not sure." However, the court denied that request.

■ Defendant contends initially that he was not proven guilty beyond a reasonable doubt because the evidence demonstrated that the complainant's initial description of the robbery differed from his appearance at the lineup, because he was too ill to have committed the armed robbery in question, and because his fingerprints were not found on the stolen purse or gun. While we reverse this cause and remand the matter for a new trial for other reasons, we examine the evidence under the authority of *People v. Taylor* (1979), 76 Ill. 2d 289, 391 N.E.2d 366.

It is well established that precise accuracy in the description of the offender by an identifying witness is not a necessity. (See *People v. Rosa* (1981), 93 Ill. App. 3d 1010, 418 N.E.2d 124.) The complainant's description of her assailant was: a 35- to 40-year-old medium-complected black man, with a curly, natural hairdo, and a thick mustache. Those particular physical characteristics matched the characteristics of defendant. Complainant further told the officers that the assailant was 5 feet 9 inches to 6 feet in height. Defendant is actually 6 feet 2 inches tall. Defendant has called attention to this height discrepancy in order to support his argument. However, the

testimony at trial indicated that defendant was standing three or four steps above the complainant when he was pointing a gun at her. It is evident that under such conditions the victim's failure to give a precise measurement of defendant's height is very understandable.

Defendant also calls attention to the disparity between the complainant's estimated weight of her assailant of 170 to 180 pounds and his weight of 250 pounds. However, the record on appeal establishes that defendant's actual weight was 220 pounds at the time he was arrested. It was also established that defendant was wearing a navy pea coat when he pointed the gun at the victim. That type of garment could have easily concealed defendant's actual weight. Accordingly, we do not find the aforesaid disparity to be material.

Defendant also calls attention to the difference between the clothing described by the complainant and the clothing that he was wearing at the time of his arrest and the lineup. However, the evidence showed that defendant was arrested an hour and a half after the offense in question was committed. We feel it was reasonable for the jury to have presumed that since defendant lived only five blocks west of the scene of the crime, he had time to go to his residence and change clothes before the police arrived.

Furthermore, the slight inaccuracies in the complainant's initial description of defendant are lessened in view of the fact that the complainant accurately identified defendant in a lineup in the police station. That lineup took place less than three hours after the armed robbery. It consisted of four black men of about the same complexion and build, each having mustaches and full heads of hair. It is true that defendant was the tallest of the group. However, the trial court, while viewing a photograph of the lineup, stated that none of the four men "[S]ticks out like a sore thumb." Under such circumstances, we must conclude that, although the complainant may have erred slightly in her initial description of defendant's height and weight, those inaccuracies do not detract from the reliability of her identification of defendant.

■ Regarding defendant's claim that he was too ill to have committed the crime, it was established by defendant's testimony that he arose at 7:30 a.m. on the date of the offense with the intent to go to work. Defendant further testified that he had been cleaning bathrooms for 17 years even though he has had the gout problem since 1969. Defendant also admitted that most of the symptoms of his disability were alleviated by medication and that on some days the pain was not very severe. Defendant further conceded that he had never come to court in a wheelchair during the 17 months that he had been

required to prepare for the present case, although he did so on the day of trial. We feel that this evidence shows that defendant was not incapacitated by his medical problem and, consequently, it was reasonable for the jury to have presumed that he was not disabled on the day of the offense in question.

Moreover, the testimony of Officer McCann indicated that the stick which defendant was carrying when arrested was not being used as a cane by defendant. Officer McCann further stated that defendant had no difficulty climbing into the squadrol without the aid of his stick. He also had no difficulty ascending a flight of stairs at police headquarters. Furthermore, Detective Flood stated that defendant never asked to see a physician. Defendant did receive treatment for his physical impairment but that treatment was rendered more than two weeks after the date of the offense. In addition, that treatment was given on an out-patient basis.

■ Defendant also contends that a reasonable doubt as to his guilt is raised by the fact that his fingerprints were not found on the gun or the stolen purse. However, it is well settled that the lack of fingerprint evidence does not necessarily raise a reasonable doubt as to guilt. Rather, it is unnecessary and cumulative where there is eyewitness testimony. (*People v. Hampton* (1979), 78 Ill. App. 3d 238, 242, 397 N.E.2d 117, citing *People v. Mimms* (1976), 40 Ill. App. 3d 942, 353 N.E.2d 186.) The complainant provided eyewitness testimony as to the offense in question in the present matter. Therefore, there was no need for the State to produce fingerprint evidence. A finder of fact could find defendant guilty beyond a reasonable doubt of armed robbery.

■ Defendant next contends that he was denied a fair trial when the trial court failed to fully examine a juror whose statement during the polling by the court indicated possible dissent from the verdict. Defendant also contends that he was denied a fair trial because of certain allegedly improper comments made by the assistant State's Attorney during the prosecution's closing argument. Since we are in agreement with defendant's first contention, we will not consider his second assertion.

A defendant in a criminal case is guaranteed a trial by an impartial jury. (*Irvin v. Dowd* (1961), 366 U.S. 717, 6 L. Ed. 2d 751, 81 S. Ct. 1639.) Essential to that guarantee is the requirement that the verdict be the product of the free and unhampered deliberations of each juror. (*Martin v. Morelock* (1863), 32 Ill. 485, 488.) The polling of the jurors is one method of safeguarding defendant's right to be tried by an impartial jury. (See generally *People v. DeStefano* (1965),

64 Ill. App. 2d 389, 212 N.E. 357.) Regarding the purpose and manner of conducting a jury poll, our supreme court has stated:

"When a jury is polled, each juror should be questioned individually as to whether the announced verdict is his own. The poll should be conducted so as to obtain an unequivocal expression from each juror. [Citation.] The very purpose of the formality of polling is to afford the juror, before the verdict is recorded, an opportunity for 'free expression unhampered by the fears or the errors which may have attended the private proceedings' of the jury room. [Citation.] In conducting the poll, each juror should be examined to make sure that he truly assents to the verdict. [Citation.]

The trial court may use its discretion in selecting the specific form of question to be asked in the polling process as long as a juror is given the opportunity to dissent. The double-barreled question used in this case, 'Was this then and is this now your verdict?' has often been used in Illinois. [Citation.] We see nothing wrong with using this question in polling the jury. However, if a juror indicates some hesitancy or ambivalence in his answer, then it is the trial judge's duty to ascertain the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to his present state of mind. [Citation.] Jurors must be able to express disagreement during the poll or else the polling process would be a farce and the jurors would be bound by their signatures on the verdict. Before the final verdict is recorded, a juror has the right *** to express disagreement with the verdict returned." (*People v. Kellogg* (1979), 77 Ill. 2d 524, 527-28, 397 N.E. 835, 838.)

Accordingly, the trial court has the obligation of fully examining those jurors whose statements indicate possible dissent from the verdict. See *People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, 292 N.E.2d 124.

■ In the present matter juror Smith twice stated that she was not sure about her verdict. However, the trial court did not afford her the opportunity to express her feelings about the verdict in an unambiguous manner. Although juror Smith eventually stated, "This is my verdict," we are not certain whether the juror was merely affirming her feeling that she was uncertain about her verdict of guilt or that she was reluctant to explain her position and was then coerced into complying with what she perceived to be the trial judge's demands. Under such circumstances, defendant is entitled to a new

trial.

For the reasons stated above, the judgment of the circuit court of Cook County is reversed and the cause is remanded for a new trial.

Reversed and remanded.

MURRAY, J., concurs.

PRESIDING JUSTICE SULLIVAN, dissenting:

The majority has reversed and remanded for a new trial on the basis of its conclusion that the trial court erred when it "failed to fully examine a juror whose statement during polling indicated possible dissent."

I believe, however, that the majority reads too much into the juror's responses. The question—"Was this and is this now your verdict?"—was asked of the jury before the polling of the individual members began and was not repeated for each individual juror. When her name was called, Mae Smith, the fifth juror polled, said, "Not sure." When the trial judge remarked, "Pardon?", the juror again said, "I'm not sure." As the judge began to ask the polling question of her individually, she interrupted him and announced, "This is my verdict."

It does not appear from this colloquy that juror Smith was expressing any doubts regarding her verdict. She may have forgotten the polling question asked preliminarily of all the jurors and needed to be reminded. This is consistent with her immediate and unequivocal answer, "This is my verdict," upon the court's attempt to restate the question. Even assuming that there was some ambiguity in her initial responses, it did not reflect dissent from the verdict and, in any event, it was dispelled when she confirmed without any prompting or coercion from the trial court that it was her verdict. Under these circumstances, reversal and remandment for a new trial on this ground is inappropriate.

The primary purpose of jury polling is to determine that the jury verdict accurately reflects each juror's vote as reached during deliberations and that the jurors' votes were not the result of force or coercion. (*People ·v. Williams* (1983), 97 Ill. 2d 252, 307, 454 N.E.2d 220.) A judge must be careful to ascertain the juror's present intent in the polling. *People v. Kellogg* (1979), 77 Ill. 2d 524, 529, 397 N.E.2d 835.

Whether a juror, in responding to a poll of the jury, has freely as-

sented to a verdict is a question of fact for the court to decide. (*People v. Herron* (1975), 30 Ill. App. 3d 788, 792, 332 N.E.2d 623.) The trial judge is in the best position to determine this question because he not only hears the juror's responses but also can observe the juror's demeanor and tone of voice. (30 Ill. App. 3d 788, 792, 332 N.E.2d 623.) A trial court's determination of whether a juror's response to a poll of the jury indicates a lack of voluntary assent to the verdict should not be overturned by a court of review unless the trial court's conclusion is clearly unreasonable. 30 Ill. App. 3d 788, 792, 332 N.E.2d 623.

In denying defense counsel's motion for a mistrial, the trial judge found that juror Smith had acknowledged the verdict as her own when she was directly asked. That finding was not unreasonable. The facts in the two supporting authorities cited in the majority opinion are distinguishable.

In the first of these, *People ex rel. Paul v. Harvey* (1972), 9 Ill. App. 3d 209, 292 N.E.2d 124, a civil paternity action in which a verdict was returned in favor of the defendant, the following colloquy occurred at trial between the court and a juror during polling:

"THE COURT: Is this and was this your verdict?

JUROR: Well, it wasn't exactly, no.

THE COURT: Did you sign this?

JUROR: Yes, I did.

THE COURT: Then it's your verdict." 9 Ill. App. 3d 209, 210, 292 N.E.2d 124.

In reversing, the appellate court found that the juror's initial answer did not show whether or not she disagreed with the verdict and that the trial judge, in treating the signing of the verdict as conclusive, had foreclosed the juror from showing that she did in fact dissent. (9 Ill. App. 3d 209, 211-12, 292 N.E.2d 124.) The court held that when the court polls the jury, it must fully examine those jurors whose statements indicate possible dissent from the verdict. (9 Ill. App. 3d 209, 212, 292 N.E.2d 124.) However, it also has been held that unless it is clear to the reviewing court that a juror indicated possible dissent, we will not reverse on jury dissent grounds. (*People v. Cabrera* (1985), 134 Ill. App. 3d 526, 530, 480 N.E.2d 1170.) In my judgment, the juror's responses in the instant case cannot reasonably be regarded as indicating dissent from the verdict. Nor can the court's attempt to restate the question be construed as foreclosing an expression of dissent.

In the other case cited by the majority, *People v. Kellogg* (1979), 77 Ill. 2d 524, 397 N.E.2d 835, the following colloquy occurred:

"THE CLERK: Susan M. Vesecky, was this then and is this now your verdict?

JUROR VESECKY: Yes. Can I change my vote?

THE COURT: The question is, was this then and is this now your verdict?

JUROR VESECKY: (No response.)

THE COURT: Was this then and is this now your verdict?

JUROR VESECKY: Yes, Sir." 77 Ill. 2d 524, 527, 397 N.E.2d 835.

The supreme court found that the juror's initial response—"Yes. Can I change my vote?"—reflected ambiguity regarding her present assent to the verdict and some reluctance to abide by the verdict which the trial court should have explored. (77 Ill. 2d 524, 530, 397 N.E.2d 835.) The court held that the impact of the judge's interrogation, his refusal to address himself to the question the juror asked, and the double-barreled question which he insisted be answered may have compelled the juror's final "Yes, Sir" response. (77 Ill. 2d 524, 529-30, 397 N.E.2d 835.) Since the court did not ascertain if it was her desire to change her vote as she had asked, or whether she desired to abide by the verdict she had signed, the record did not reflect that the verdict of guilty was a unanimous verdict. (77 Ill. 2d 524, 530, 397 N.E.2d 835.) The facts in *Kellogg* clearly are distinguishable from those in the case at bar. Here, the juror never asked if she could change her vote and it strains credulity to suggest that the court compelled her assent to the verdict.

In *Kellogg*, the supreme court held that if a juror indicates some hesitancy or ambivalence in his answer upon being polled, then it is the trial judge's duty to ascertain the juror's present intent by affording the juror the opportunity to make an unambiguous reply as to his present state of mind. (77 Ill. 2d 524, 528, 397 N.E.2d 835.) Even assuming that juror Smith's initial responses were ambiguous, it is noted that she immediately and unequivocally stated, "This is my verdict," before the judge could complete restating the question asked of the jury as a whole. It thus cannot reasonably be said that her statement confirming her verdict was prompted or coerced by the trial judge.

Several cases in Illinois, not cited in the briefs or in the majority opinion, have dealt with the question of whether a juror's unorthodox response, during a poll of the jury, negated the unanimity of a guilty verdict in a criminal trial. In one case the foreman of the jury, when asked by the clerk whether this was his verdict, replied, "It wasn't, but it is." (*People v. Herron* (1975), 30 Ill. App. 3d 788, 789, 332

N.E.2d 623.) In another case a juror, when asked by the clerk whether this was her verdict, replied, "No. No, sir." The court then inquired whether this was her verdict and she changed her answer, stating, "Yes, sir." (*People v. Hill* (1973), 14 Ill. App. 3d 20, 22, 302 N.E.2d 373.) In a third case a juror responded, "I pleaded guilty, yes." (*People v. Massie* (1972), 5 Ill. App. 3d 432, 283 N.E.2d 293.) In all three cases it was held that the responses did not demonstrate any lack of unanimity among the jurors. In *Herron*, the court commented that whatever the phrase, "It wasn't, but" was meant to mean, it did not take away from the fact that the foreman stated that the guilty verdict "is" his verdict now. *People v. Herron* (1975), 30 Ill. App. 3d 788, 791, 332 N.E.2d 623.

In *People v. Gardner* (1976), 40 Ill. App. 3d 700, 702, 352 N.E.2d 448, the following exchange transpired between the trial judge and juror Bunetic during the polling of the jury:

"THE COURT: Mr. Bunetic?

JUROR BUNETIC: I give my verdict as not guilty, but there was certain points that I was not certain of, that I was *** reluctant, I should state.

THE COURT: Did you sign this verdict?

JUROR BUNETIC: I signed it guilty.

THE COURT: Is this your verdict?

JUROR BUNETIC: I signed it guilty, sir."

The appellate court found that the juror had been given ample opportunity to disavow the verdict. (40 Ill. App. 3d 700, 704, 352 N.E.2d 448.) His initial response was ambiguous and did not necessarily support the interpretation that he wished to disavow the verdict. The court did not regard the trial judge's questions as hindering or foreclosing the juror's expression of an unwillingness to acquiesce in the verdict. The trial court found that a unanimous verdict of guilty had been reached. The appellate court held that this finding was not clearly unreasonable and affirmed defendants' convictions. 40 Ill. App. 3d 700, 704, 352 N.E.2d 448. See also *People v. Preston* (1979), 76 Ill. 2d 274, 280-81, 285-87, 391 N.E.2d 359 (juror initially responded "compromise" during poll of jury but, upon further questioning by the court, expressed her assent to the verdict).

In *People v. Riddle* (1977), 49 Ill. App. 3d 46, 48, 363 N.E.2d 881, the following exchanges took place between the court and two jurors:

"THE COURT: Mr. Gunter, is this your verdict?

JUROR GUNTER: Yes, sir.

THE COURT: Are you satisfied with it?

JUROR GUNTER: In a way I was and in a way I wasn't.
THE COURT: Do you want this to be your verdict?
JUROR GUNTER: I guess it will have to be.
THE COURT: And do you want me to accept it?
JUROR GUNTER: Yes, sir.

\* \* \*

THE COURT: Mrs. Christian, is this your verdict?
JUROR CHRISTIAN: Yes, sir.
THE COURT: Are you satisfied with it?
JUROR CHRISTIAN: In some ways and in some ways not.
THE COURT: Do you want me to accept it?
JUROR CHRISTIAN: Yes, sir."

In reviewing these responses, the appellate court stated:

"It cannot reasonably be maintained that jurors Christian and Gunter were not given ample opportunity to express grave doubts or to disavow the verdict. The court's line of questioning seeking to determine each juror's satisfaction with the verdict was aimed to elicit the juror's true feelings. It is true that the responses in question were unorthodox, but they were not expressions of dissent as defendant would have us believe. There is no sign that the jurors were coerced by their fellow jurors in this case. Nor is there any indication that the questions put forth by the court were in any way oppressive or designed to coerce assent to a verdict of guilty. The court took care to see that expressions of dissent by the jurors were not hindered." 49 Ill. App. 3d 46, 48-49, 363 N.E.2d 881.

It is apparent from a review of the foregoing authorities that reversal of defendant's conviction on the ground presented in the majority opinion would be inappropriate. Moreover, as stated above, even assuming that juror Smith's initial responses reflected some possible ambiguity, that ambiguity was dispelled when she confirmed without any prompting or coercion by the trial court that, "This is my verdict." She had an opportunity to express dissent from the verdict but failed to do so. Her unequivocal acceptance of the verdict required no further inquiry by the court.