Filed 8/22/08          NO. 4-07-0474

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|       Plaintiff-Appellee, | ) | Circuit Court of |
|       v. | ) | Macon County |
| AARON M. BEASLEY, | ) | No. 06CF1527 |
|       Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

A jury found defendant, Aaron M. Beasley, guilty of unlawful possession of more than 400 grams but less than 900 grams of a substance containing cocaine with intent to deliver (720 ILCS 570/401(a)(2)(C) (West 2006)). The trial court sentenced defendant to 12 years' imprisonment, which was the minimum sentence under the statute. On appeal, defendant challenges the sufficiency of the evidence and, in the alternative, raises several arguments concerning the fairness of his trial. Though we find the evidence sufficient, we reverse and remand for a new trial.

I. BACKGROUND

A. Defendant's History and Living Circumstances

Defendant, age 26 at the time of the offense, was a community-college student who worked several temp-service jobs. Prior to the conviction at issue here, defendant had never been

charged with a crime as an adult. Defendant had one juvenile conviction for possession of 10 to 30 grams of cannabis, for which he received nine months' supervision.

Defendant split his place of residence between his parents' home at 1359 East Condit in Decatur, Illinois, and the apartment of his girlfriend, Shanitera Walker. Living at 1359 Condit were defendant's mother (Roni), father (Calvin), sister (Amanda), and his toddler son, custody of whom he shared with Shanitera. According to those living in the house, defendant's bedroom was not very private; the bedroom door could not be locked and the bedroom closet was used as a household receptacle, storing other family members' clothes, space heaters, and irons. Defendant's older brother, Shawn Beasley, who is also the codefendant in this case, did not live at 1359 Condit but, according to Roni, visited two to three times per week for several hours at a time. Before he moved out, Shawn had shared defendant's bedroom.

## B. The Instant Crime

On Monday, June 5, 2006, while conducting a drug investigation against Shawn, Decatur police officers served a warrant on Shawn's apartment on 25th Street in Decatur. Then, pursuant to information that Shawn was possibly storing cocaine at 1359 Condit, Decatur police officer James Root directed several officers to go to the Beasleys' family home. Roni gave

the police permission to search the house.

The police found two safes in defendant's bedroom closet. One of the safes was unlocked and "emitted the aroma of cocaine" when opened. The safe contained a black foam liner that was later determined to contain cocaine residue and a piece of paper that listed approximately 15 first names and initials with numbers ranging from 80 to 1,000 next to the names. Eighty dollars is the typical price for a gram of cocaine; the other numbers also matched typical prices for common sale quantities of cocaine. The initials of defendant, "A.B.," and the initials of Shawn, "S.B.," were both on the list. Officer Root opined that this list was a drug record, but the handwriting in the list was never compared to the handwriting of Shawn or defendant. The handle of the safe contained Shawn's fingerprints. The inside lid of the safe contained defendant's left-thumb fingerprint. The age of the prints could not be determined. When asked at trial why his fingerprints may have been on the inside lid of the safe, defendant answered:

"Uh--I had to have probably just moved it out

of the way while looking for something else.

But, other than that, I would not know. ***

[Maybe] the lid was up or it was laid down."

Also in defendant's bedroom, police found a pair of latex gloves on top of a small refrigerator. In a small trash

- 3 -

can next to the refrigerator, police found sandwich bags that had the corners cut (consistent with packaging smaller quantities of cocaine). According to Amanda, both Shawn and defendant had been home the day before the search, but only Shawn stayed overnight and slept in defendant's bedroom. Before that, defendant had been on a weekend trip with Shanitera in St. Louis.

In the basement crawl space, police found an "Old Navy" shopping bag and another safe. Roni testified the bag belonged to her, she had used it to store gardening supplies, and she had last seen it a week prior to the search. In the shopping bag, police found nearly $70,000 worth of cocaine, which was further contained in several sandwich bags. In the safe, which was locked and subsequently pried open by police, police found baking soda, which is often used as a cutting agent for cocaine, and a white plastic container containing wet wipes. Police found Shawn's fingerprints on the white plastic container but did not submit the baking soda box for testing. Defendant testified that he had seen a safe in the basement within the last year but did not know which of the three safes found in the search it had been. When defendant saw the safe, it was not in the crawl space.

C. Investigation Against Defendant

On June 6, 2006, the day after the search, defendant voluntarily went to the police station for questioning. Defen-

dant told police that Shawn had a key to the family home at 1359 Condit. Shawn periodically lived at 1359 Condit and stored things in defendant's bedroom. Defendant often stayed over at his girlfriend Shanitera's apartment and did not know anything about the safe, the gloves, or the sandwich bags found in his bedroom. Defendant had seen a safe in the basement approximately a year ago.

On August 15, 2006, Shanitera saw defendant with another woman at the movie theater. Defendant and Shanitera got in a dispute. The police arrived and arrested Shanitera for domestic battery. While incarcerated, Shanitera contacted the sheriff's department to talk to them about defendant. Shanitera told police that, following the June 2006 investigation, defendant told her that he would be staying with her for awhile because the police had found the drugs at his parents' house. After Shanitera implicated defendant in the instant drug case, the State dropped the domestic-battery charges against her.

In October 2006, the State charged both defendant and Shawn with unlawful possession of more than 400 grams but less than 900 grams of a substance containing cocaine with intent to deliver.

### D. Trial

At trial in early February 2007, Shanitera testified that defendant had told her that the drugs confiscated in the

June 2006 search belonged to him and his brother and that he knew about the safe in the bedroom. Shanitera testified that she was no longer upset with defendant at the time of trial. During cross-examination, Shanitera admitted that she had saved newspaper clippings about the investigation, which mentioned the safe in the bedroom. Shanitera also revealed that she was released from jail on the domestic-battery charges the very same day she decided to speak to police regarding the instant drug case. Shanitera also stated that she was trying to recover custody of the son that she shared with defendant from the Beasley family.

According to defendant, he never told Shanitera that the drugs were his. He only told her what he had learned of the investigation through the police. Defendant testified that, when he and Shanitera began to fight, Shanitera told him she would make his life a "living hell." According to defendant's sister Amanda, Shanitera called the Beasley residence in a harassing manner on many occasions. According to Amanda, Shanitera expressed her feelings that defendant had "done her wrong" and stated, "that's okay cause I'm coming out of jail, and Aaron will be going in."

During closing argument, the defense noted that the State never bothered to have several items checked for fingerprints, such as the box of baking soda found in the basement safe, or the list of names found in the bedroom safe. In rebut-

tal, the State responded:

> "[T]hey examined the plastic container which
> was sitting right beside the baking soda, but
> yet, this baking soda somehow becomes a huge
> glaring gap. *** Well, if this had been sent
> in and the defendant's print would have been
> on this, we would have just as much of a
> story that was concocted as there was--"

The defense objected to the implication that the defense was concocting stories. The court replied: "He didn't say the defense concocted the story. He said the story was concocted. *** Overruled." The State went on to provide a hypothetical where, if it had in fact tested the box of baking soda for prints and the results had come back with defendant's prints on the box, then it would not be "hard" for defendant to "refute the physical evidence" by saying his prints were on the box because he had been "baking cookies." The following exchange then took place regarding the absence of fingerprints on certain items:

> "STATE: You, also, learned that evidence
> can be requested to be sent to the [l]ab for
> examination. There was no request [by defen-
> dant] to do so.
>
> DEFENSE: Objection as to this line of
> argument which shifts the burden

impermissibly.

THE COURT: Overruled.

STATE: If *** it's unconscionable on the part of [the State,] it's just as unconscionable on the part of the defense.  So, if you want something tested, you can get it tested.  You can't sit back and say, 'Well, nobody tested it; therefore, the evidence fails.'"

The jury received instructions on accountability. During jury deliberations, the jury sent the court a note, which read:

"Could we have a more clear clarification of [i]f [sic] you know about a crime being committed but do nothing and later get arrested as a participant in the crime is that a sign of guilt."

The defense suggested that the answer should be, "no, it is not." Instead, the trial court told the jurors: "You must rely on the instructions you have already been given."

Following deliberations, all 12 jurors signed the guilty verdict, including Vernard Fuller.  When the court polled the jury, each juror except Fuller answered only with a "yes." When the court polled Fuller, the following exchange took place:

"THE COURT: Mr. Fuller, is this your

verdict?

JUROR FULLER: Um--I have to say, yes, I guess.

THE COURT: Okay.

DEFENSE: Well, I'm--

THE COURT: Okay.  Thank you.  He said, 'Yes,' I believe.  Mr. Doyle, is this your verdict?  [The court then proceeded to poll several more jurors.]

THE COURT [upon polling all the jurors]: Okay.  Anything else, counsel?

DEFENSE: Judge, I don't believe that Mr. Fuller really indicated--

STATE: Can we--

THE COURT: Well, let's--do you want to take them out for just a minute? [Upon which, the jury left the courtroom.]

***

THE COURT: Okay. Thank you.  Miss Reporter, would you, please, read back Mr. Fuller's response? (Whereupon, the question and the response was read back by the court reporter.)

DEFENSE: He was kind of shaking his head

- 9 -

as he said that, Your Honor. I mean, the only reason I said something is I've never had someone be somewhat equivocal.

THE COURT: He may not have been happy with what the result was, but I think his-- his answer is not equivocal. His answer is that's his verdict. Anything else then, counsel?

STATE: No.

THE COURT: Mr. Vigneri [(defense counsel)]?

DEFENSE: Just to preserve the record, I guess I'd ask for a mistrial or further polling of Mr. Fuller.

***

THE COURT: *** I mean, these people aren't here to be badgered about and bullied. He's indicated that was his verdict. Uh--and so, I'm--Mr. Scott [(prosecutor)], do you want him brought--brought back in?

STATE: I see no need to.

THE COURT: I don't either."

### E. Posttrial

On March 12, 2007, defendant filed a posttrial motion.

- 10 -

Among other claims, defendant argued that newly discovered evidence warranted granting a new trial. Defendant noted: "Codefendant Shawn D. Beasley has now pleaded guilty and has made written and oral statements indicating that the cocaine in question was possessed solely by him and that this [d]efendant had no knowledge of the same." Defendant's trial attorney filed an affidavit stating:

> "On February 22, 2007, [several weeks after trial], I was provided with Shawn Beasley's written statement in which he assumed full responsibility for the drugs which are the subject of this *** case and in which he indicated that only he had knowledge of the presence of the drugs at the Condit Street residence."

Defendant also attached a written statement by Shawn, which read:

> "I would like [Y]our [H]onor to know that the people of 1359 E. Condit had no knowledge of the illegal substances that were found in [their] house. Especially Aaron M. Beasley."

Defendant later filed a supplemental posttrial motion that attached an affidavit by Shawn stating the same and further stating that if called at defendant's trial, he would have asserted his fifth-amendment rights.

- 11 -

Defendant also attached the affidavit of juror Fuller. Fuller stated he only signed the guilty form because other jurors "ganged up" on him. He "felt coerced by them to sign." He stated that when the judge asked him if that was his verdict, he "never said 'Yes' and in fact *** said 'No.'" At the time the court asked Fuller, "and at all other times, he did not agree with the guilty verdict." Fuller further stated:

> "I was trying to explain to the judge my disagreement with the verdict, but the judge cut me off and did not give me an adequate opportunity to respond to his question and to tell him in no uncertain terms that I dis-agreed with the verdict and was voting 'not guilty.' Had the judge given me an adequate opportunity to respond, that is what I would have told him. The judge did not let me finish my answer to his question."

On April 9, 2007, the defense filed a criminal subpoena requesting all audio and video recordings of the jury poll. The State filed a motion to quash and the trial court granted the motion. Defendant filed a subsequent posttrial motion challeng-ing the court's decision to quash the subpoena, which the court denied. The court sentenced defendant as stated. This appeal followed.

- 12 -

II. ANALYSIS

A. Sufficiency of the Evidence

Defendant first challenges the sufficiency of the evidence. In reviewing the sufficiency of the evidence, the question is "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (Emphasis omitted.) People v. Bishop, 218 Ill. 2d 232, 249, 843 N.E.2d 365, 375 (2006), quoting Jackson v. Virginia, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979). The phrase "any rational trier of fact" does not allow an appellate court to relax its duty to carefully consider whether the evidence was sufficient to sustain a guilty verdict. People v. Minniweather, 301 Ill. App. 3d 574, 577, 703 N.E.2d 912, 913-14 (1998). In balance, however, an appellate court may not reverse a conviction "unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt." People v. Collins, 214 Ill. 2d 206, 217, 824 N.E.2d 262, 267-68 (2005). A court of review may not substitute its own judgment for that of the trier of fact on matters of credibility or weight of the evidence. See People v. Brink, 294 Ill. App. 3d 295, 300, 690 N.E.2d 136, 139 (1998).

To be convicted of possession with intent to deliver,

the State must prove beyond a reasonable doubt that (1) defendant had knowledge of the presence of the controlled substance; (2) the controlled substance was in the immediate control or possession of defendant; and (3) defendant intended to deliver the controlled substance. People v. Schmalz, 194 Ill. 2d 75, 81, 740 N.E.2d 775, 779 (2000). Where narcotics are found on the premises over which the defendant has control, it may be inferred that the defendant had the requisite knowledge and possession, absent other facts and circumstances that create a reasonable doubt of the defendant's guilt. People v. Smith, 191 Ill. 2d 408, 413, 732 N.E.2d 513, 515 (2000). Possession may be joint. Schmalz, 194 Ill. 2d at 82, 740 N.E.2d at 779. To be convicted of possession with intent to deliver on an accountability theory, the State must prove beyond a reasonable doubt that Shawn was guilty of possession with intent to deliver and that defendant, "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, *** solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2006).

Defendant argues that the State did not establish guilt directly or on an accountability theory because (1) evidence indicated that Shawn had access to the places the contraband was found and had slept in defendant's bedroom immediately prior to

- 14 -

the search; (2) evidence of defendant's fingerprints on the safe in the bedroom closet could not reliably tie defendant to the crime because the State did not establish when the fingerprints had been impressed; and (3) Shanitera's testimony tying defendant to the crime was "unreliable and untrustworthy."  We agree that a rational jury may have just as easily reached a "not guilty" verdict on the facts of this case.

However, establishing that the evidence is closely balanced is not the standard for finding the evidence to be insufficient.  Defendant's prints were on the inside of the safe where cocaine residue was found.  Defendant's initials were found on the list inside the safe that investigators believed to be records of drug sales.  The jury may have found it incredible that defendant would not have known anything about the safe that was found in his bedroom closet.

Additionally, there is the issue of Shanitera's testimony.  Shanitera testified that defendant told her that he and Shawn had been in possession of the drugs for a week or so prior to the search.  Shanitera testified that defendant told her that the police "got the stuff" and that defendant would therefore be staying with her for a while.  The jury was made aware that Shanitera had an axe to grind with defendant and that Shanitera's pending charges may have motivated her to cooperate with police, but the jury chose to believe Shanitera anyway.  We will not

upset the jury's determination of Shanitera's credibility.  The State's evidence against defendant was sufficient to convict.

## B. New Trial

Defendant next points to several alleged errors that may have prevented him from receiving a fair trial, including (1) the State's implication during closing argument that defendant was required to prove his innocence; (2) the trial court's failure to question an ambivalent juror during polling; (3) indications that the jury may have been confused as to a point of law regarding accountability; and (4) the exculpatory evidence contained in Shawn's affidavit and written statement.  We find the State's implication that defendant was required to prove his innocence and the trial court's failure to question the ambivalent juror particularly troubling and find that they warrant remand for a new trial.

## 1. Burden of Proof

The defense is under no obligation to produce any evidence, and the prosecution cannot attempt to shift the burden of proof to the defense.  People v. Woods, 292 Ill. App. 3d 172, 180, 684 N.E.2d 1053, 1059 (1997) (Cook, J., dissenting).  Courts have found error where the prosecution implied that the defendant had an obligation to come up with evidence to create a reasonable doubt of his guilt.  See People v. Nevitt, 135 Ill. 2d 423, 453, 553 N.E.2d 368, 379 (1990) (error, though not plain error, for

prosecution to comment on defendant's failure to produce an alibi witness); People v. Weinstein, 35 Ill. 2d 467, 469-70, 220 N.E.2d 432, 433-34 (1966) (reversible error where 17 objections were made as to prosecution's misleading statements of the burden of proof). Here, in closing argument, the State said:

> "If *** it's unconscionable on the part of
> [the State not to test certain items for
> fingerprints,] it's just as unconscionable on
> the part of the defense. So, if you want
> something tested, you can get it tested. You
> can't sit back and say, 'Well, nobody tested
> it; therefore, the evidence fails.'"

The State argues that its comments were appropriate because the defense opened the door by first stating that it was unconscionable that the State failed to get certain items tested for fingerprints (People v. Singleton, 367 Ill. App. 3d 182, 190, 854 N.E.2d 326, 333-34 (2006) (defendant cannot object to a line of inquiry that he invited)), and it further claims that it was merely pointing out defendant's constitutional right to conduct his own tests on physical evidence. See People v. Peeples, 155 Ill. 2d 422, 477, 616 N.E.2d 294, 319 (1993). First, while defendant may have invited the State to explain why it chose not to submit certain items for fingerprinting, a defendant in a criminal case can never "open the door" to shift the burden of

proof.  Moreover, defendant, though <u>able</u> to submit evidence for analysis, has no burden to do so.  A defendant's failure to submit evidence for analysis cannot be considered "unconscionable."  Further, by overruling defendant's objections to these types of comments by the State, the trial court was in effect sanctioning an erroneous burden of proof before the eyes of the jury.

## 2. <u>Jury</u> <u>Poll</u>

Regarding juror Fuller's allegedly equivocal answer during polling, the question of whether a juror has freely assented to the verdict is a factual one that is left to the discretion of the trial court.  <u>People v. Chandler</u>, 88 Ill. App. 3d 644, 650, 411 N.E.2d 283, 288 (1980).  Polling the jury safeguards the defendant's right to a verdict that is the product of the free and unhampered deliberations of each juror.  <u>People v. Bennett</u>, 154 Ill. App. 3d 469, 475, 507 N.E.2d 95, 99 (1987).  The polling should be done in a manner that elicits an "unequivocal" response from each juror.  <u>People v. Kellogg</u>, 77 Ill. 2d 524, 528, 397 N.E.2d 835, 837 (1979).  The trial judge should not turn the polling process into an opportunity for further deliberations; however, if a juror expresses "some hesitancy or ambivalence" in his answer, then it is the trial judge's duty to ascertain the juror's present intent by affording the juror the

opportunity to make an unambiguous reply.  <u>Kellogg</u>, 77 Ill. 2d at 528, 397 N.E.2d at 837.

In <u>Kellogg</u>, upon being asked whether the guilty verdict was and is her final verdict, the 21-year-old juror responded, "Yes.  Can I change my vote?"  The trial judge did not answer the juror, but instead repeated the question.  The juror did not respond, and the trial judge repeated the question again.  That time, the juror responded, "'Yes, sir.'"  <u>Kellogg</u>, 77 Ill. 2d at 527, 397 N.E.2d at 837.  The supreme court held that the juror had expressed a reluctance to abide by the verdict and that the trial judge did not sufficiently determine her present intent.  <u>Kellogg</u>, 77 Ill. 2d at 530, 397 N.E.2d at 838.  The <u>Kellogg</u> court noted it could not tell from the record whether the juror truly assented to the verdict or whether she responded to the judge, a person of authority, with a compelled answer.  <u>Kellogg</u>, 77 Ill. 2d at 530, 397 N.E.2d at 838.

In <u>Bennett</u>, when asked whether the guilty verdict was and is her final verdict, the juror answered, "'Not sure.'"  The trial judge replied, "'pardon?'"  The juror again answered, "I'm not sure."  The judge then began to repeat the question, "'Is this,'" but the juror cut the judge off and answered, "'This is my verdict.'"  <u>Bennett</u>, 154 Ill. App. 3d at 473, 507 N.E.2d at 97-98.  The <u>Bennett</u> court held that the judge did not give the juror an opportunity to express her verdict in an unambiguous

manner.  Bennett, 154 Ill. App. 3d at 476, 507 N.E.2d at 100.
The Bennett court thought it was possible that the juror felt
reluctant to explain her position and then was coerced into
complying with what she believed to be the trial judge's wishes.
Bennett, 154 Ill. App. 3d at 476, 507 N.E.2d at 100.

Here, juror Fuller expressed some hesitancy or ambiva-
lence in his answer when he stated, "Um--I have to say, yes, I
guess," while shaking his head.  The trial court therefore had a
duty to ascertain Fuller's present intent by giving him the
opportunity to make an unambiguous reply.  Kellogg, 77 Ill. 2d at
528, 397 N.E.2d at 837.  Juror Fuller was never given the oppor-
tunity to restate his position more clearly.  As he testified in
his affidavit, juror Fuller felt "cut off" by the trial judge and
was therefore not able to express his dissent from the verdict.

The cases cited by the State for the proposition that
unorthodox responses are not necessarily expressions of dissent
are distinguishable.  See People v. Riddle, 49 Ill. App. 3d 46,
48-49, 363 N.E.2d 881, 883 (1977).  In Riddle, the following
exchange took place during the polling of two jurors:

"'COURT: Mr. Gunter, is this your ver-
dict?

A: Yes, sir.

Q: Are you satisfied with it?

A: In a way I was and in a way I wasn't.

- 20 -

Q: Do you want this to be your verdict?

A: I guess it will have to be.

Q: And do you want me to accept it?

A: Yes, sir.

* * *

Q: Mrs. Christian, is this your verdict?

A: Yes, sir.

Q: Are you satisfied with it?

A: In some ways and in some ways not.

Q: Do you want me to accept it?

A: Yes, sir.'"  Riddle, 49 Ill. App. 3d

at 48, 363 N.E.2d at 883.

In Riddle, the jurors responded unequivocally that this was their verdict and that they wanted the court to accept their verdict, but expressed uncertainty as to how they felt about the verdict. See also People v. Cabrera, 116 Ill. 2d 474, 490, 508 N.E.2d 708, 714 (1987) (the fact that trial court did not allow juror to express her rationale did not make trial court's determination that juror voluntarily assented to the verdict unreasonable). Moreover, as noted by the appellate court, the trial court gave the jurors ample opportunity to disavow their verdict. Riddle, 49 Ill. App. 3d at 48, 363 N.E.2d at 883. In our case, juror Fuller was not permitted to speak again after making his initial statement.

- 21 -

The State also points to Cabrera for the proposition that a juror's statement in an affidavit, taken after the jury has rendered its verdict, has been polled in open court, and has been discharged, will not be admitted to impeach a juror's verdict. Cabrera, 116 Ill. 2d at 491, 508 N.E.2d at 714-15. However, regardless of whether Fuller's affidavit is admissible to show the process by which Fuller came to sign the guilty verdict, Fuller's affidavit would be admissible to show that he felt "cut off" by the trial judge during polling and would have liked to explain to the trial judge that he actually dissented from the verdict.

Finally, the State points to two cases from outside our jurisdiction wherein the jurors made statements similar to Fuller's during polling and the court(s) found the jurors' statements sufficiently unequivocal. See State v. Wiese, 162 Wis. 2d 507, 516-17, 469 N.W.2d 908, 911 (1991) (the juror initially said she "'wasn't completely sure,'" then, upon further inquiry by the court, answered, "'yes, I guess so,'" and then, after questioning all the other jurors and coming back to the questionable juror, the juror answered "'yes'"); State v. Boyd, 2005-Ohio-73, at ¶13 (juror stated "'Yeah, I guess. Yes,'" and then "'Well, yes, I guess. Yes'") (Ohio Appellate 9th District 2005). Unlike the instant case, the jurors in Wiese and Boyd were allowed to make additional, clarifying statements. Also,

- 22 -

nothing here indicates that the jurors in Wiese and Boyd were exhibiting ambivalent body language while they spoke, as compared to the instant case where juror Fuller was reportedly shaking his head.

### 3. Remaining Contentions

Because we reverse and remand on the above-stated grounds, we decline to address defendant's remaining contentions of error. Because the evidence was sufficient to permit the jury to convict defendant for possession with intent to deliver, double jeopardy is not implicated. People v. Taylor, 76 Ill. 2d 289, 309-10, 391 N.E.2d 366, 375 (1979).

### III. CONCLUSION

For the aforementioned reasons, we reverse the trial court's judgment and remand for a new trial.

Reversed and remanded.

McCULLOUGH and MYERSCOUGH, JJ., concur.