2015 IL App (1st) 132782

No. 1-13-2782

Fifth Division
September 18, 2015

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT
_____

| | | |
|---|---|---|
| | ) | |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| Plaintiff-Appellee, | ) | |
| | ) | No. 08 CR 13811 |
| v. | ) | |
| | ) | The Honorable |
| AARON KELLEY, | ) | Kevin M. Sheehan, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |
| | ) | |

_____

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Reyes and Justice Palmer concurred in the judgment and opinion.


**OPINION**

¶ 1    Defendant Aaron Kelley was convicted by a jury of the first-degree murder of Edna Marie Smith and sentenced to 35 years with the Illinois Department of Corrections (IDOC).

¶ 2    On this direct appeal, defendant claims: (1) that the State impermissibly shifted the burden of proof to defendant by eliciting testimony from its expert witnesses that defendant could have requested evidence to be tested; (2) that the State committed misconduct by attacking defense counsel's integrity during its closing and rebuttal arguments; and (3) that defendant's sentence of 35 years was excessive.

¶ 3    For the following reasons, we affirm.

¶ 4                                    BACKGROUND

¶ 5                                    I. Evidence at Trial

¶ 6                                    A. Summary

¶ 7    Defendant Aaron Kelley was convicted by a jury of the murder of Edna Marie Smith,[1] who was found dead on the night of July 4, 2007, at the 7100 block of South Talman Avenue in Chicago, Illinois after being beaten and stabbed.

¶ 8    The evidence at trial showed that a witness had observed defendant in Marie's apartment earlier that day, and two other witnesses observed him leaving the apartment through a bedroom window shortly before Marie's body was discovered. When defendant was later arrested, he told the police that Marie was an old friend, and he had visited her apartment and they had sex. Defendant told police that, afterwards, he was attacked by a man whom he believed to be Marie's boyfriend, who stabbed him in the hand with a knife; and that defendant then fled out the back door.

¶ 9    The evidence at trial included the testimony of: (1) Sammie Smith, Marie's estranged husband; (2) Korderro Green, who observed defendant in Marie's apartment earlier that day; (3) Jessica Ford, who observed defendant descending from Marie's window and dropping a knife; (4) DeEdna Porter, who also observed defendant descending from Marie's window and dropping a knife; (5) Officer Paul Presnell, who investigated the murder scene; (6) William Kelley, defendant's brother; (7) Officer Alexander Parrilla, who interviewed defendant the day after the murder; (8) Chief Medical Examiner Stephen Cina, who reviewed the autopsy;

---

[1]Since the decedent's husband, Sammie Smith, was a witness, we refer to them by their first names. In addition, since Edna Marie Smith was referred to as "Marie" throughout the witness testimony, we will do the same.

(9) Sergeant John Foster, who flew to Los Angeles on June 21, 2008, to transport defendant back to Chicago; (10) Quiana Foster, Marie's daughter, who identified the victim's body; and (11) Jamie Jett, a hair analyst called by the defense.

¶ 10                                    B. Sammie Smith, Victim's Husband

¶ 11       Sammie Smith testified that he was Marie's husband, that they were separated, and that he lived in a different apartment in the same building. On the night of July 4, 2007, Sammie was outside the building, viewing the holiday fireworks. At 10:30 p.m., he noticed a crowd gathering outside the building and calling Marie's name. Sammie went to the front door of Marie's apartment, but the door was locked so he went to the rear entrance and, with the help of others, kicked open a locked gate. Sammie went inside the apartment and observed Marie's body on the floor of her bedroom. There was no one else in the apartment. Police and emergency personnel arrived shortly thereafter.

¶ 12                                    C. Korderro Green, Occurrence Witness

¶ 13       Korderro Green testified that his girlfriend lived in the same building as Marie, and that he went to visit his girlfriend at 4 p.m. on July 4, 2007, but she was not at her residence; so Marie allowed him to wait in her unit. Green noticed a red and black bicycle in the hallway and briefly observed a black male guest in Marie's bedroom. He described the man as in his twenties or thirties and having short hair. In court, Green identified defendant as the man he observed. After a few seconds, Marie closed the bedroom door and Green proceeded to the guest bedroom. There, he watched television, smoked marijuana, and napped. His girlfriend called him at about 7 p.m., and Marie let him out through the front door. He noticed that the bike he had observed earlier in Marie's apartment was now parked outside the building. Green further testified that he encountered Marie regularly, knew that she used drugs, and

believed it was not unusual for her to have more than one person in her home at a time. Green had prior convictions for delivery of a controlled substance and possession of cannabis.

¶ 14                    D. Jessica Ford, Occurrence Witness

¶ 15        Jessica Ford testified that she was at the building where Marie resided until about 4 p.m. on July 4, 2007. As she was leaving, a man on a bicycle approached the apartment, knocked on the front door, and was allowed in by Marie. She initially testified that the bike was black and blue, but then stated she could not remember the color. She described the man as wearing a hat. In court, she identified defendant as the man she observed. That night, Ford and several friends gathered on the street corner near Marie's apartment. DeEdna Porter, one of her friends, drew Ford's attention to Marie's bedroom window. Ford looked, and noticed a man climbing out of the window, hanging from the ledge and facing the building. Ford testified that she could observe his face and the side of his body. The man dropped to the ground, dropped a knife, and then picked it up before running toward an alley behind the building. The apartment's exterior was illuminated by a streetlight across the street and by a second streetlight located in the alley which was opposite the building from the bedroom window. In court, Ford identified defendant as the man whom she observed exiting the window. Ford attempted to enter Marie's apartment through the front door, but it was locked. She then walked to the rear entrance, where someone had already forced open the gate. Entering the apartment, she observed Marie's body. She testified that she gave a full statement to the police, but the parties stipulated that none of the responding officers reported speaking with her.

¶ 16                                    E. DeEdna Porter, Occurrence Witness

¶ 17        DeEdna Porter testified that she was with Ford and some other friends after 9 p.m. on the night of July 4, 2007. While outside, she observed a man at what she believed to be Marie's living room window. Porter testified that the man sat on the ledge of the window for 10 to 20 seconds. However, she had previously told police that the man was hanging from the window ledge, not sitting on it. Porter asked "who was that," and the man looked at her and jumped to the ground. The man dropped a knife, picked it up, and ran to the alley opposite the building. Porter ran after him briefly, but stopped because he had a knife. She described the man as wearing a red baseball hat, and said that his hair had twists with braids. In court, Porter identified defendant as the man she observed.

¶ 18                                    F. Chicago Police Officer Paul Presnell

¶ 19        Officer Paul Presnell testified that Marie's body was found on the floor of a rear bedroom, next to a serrated knife and a wooden post. Investigators found bloodstains on the outside ledge of the bedroom window, and on that window's curtain. They also took swabs of bloodstains from the door, the handle, and the frame of the door leading to the bedroom. They recovered a towel with bloodstains from the kitchen, and took photographs of the kitchen sink which appeared to contain blood and water. Officer Presnell testified that he lifted a fingerprint from the window, and put bags around Marie's hands to preserve any possible evidence.

¶ 20                            G. William Kelley, Defendant's Brother

¶ 21        The State called William Kelley, defendant's brother,[2] who testified that defendant had been living with him and that he let defendant borrow his bike on multiple occasions. On July 4, 2007, at 10 p.m., William observed defendant outside his house. Defendant's hands were wrapped, and he asked William to take him to a hospital. William dropped defendant off at Mercy Hospital. After defendant returned from the hospital, he stayed at William's house for a week, until William asked him to leave, which he did.

¶ 22                        H. Chicago Police Officer Alexander Parrilla

¶ 23        Officer Alexander Parrilla testified that he responded to a call at Mercy Hospital at 3:28 a.m. on July 5, 2007, where he met with defendant. Officer Parrilla testified that defendant stated that, at 9:30 p.m. on July 4, 2007, he had been approached by three black men who demanded his bike. One of the offenders fought with defendant and cut his hand. Officer Parrilla testified that defendant was not sober and had scratches on his right hand and arm.

¶ 24                            I. Dr. Stephen Cina, Medical Examiner

¶ 25        Dr. Stephen Cina, the chief medical examiner for Cook County, testified that he reviewed the victim's autopsy, which showed that she had sustained 93 external injuries. Forty-six of her injuries were blunt force injuries, and the remaining 47 were incised wounds. Some of the injuries were consistent with defensive wounds. Dr. Cina testified that the cause of death was cranial cerebral injuries due to blunt force impacts, but that the incised wounds and cuts were a significant contributory condition to death. Dr. Cina testified that Marie's death was a homicide. The toxicology report indicated that cocaine and cocaine metabolite were present in Marie's blood.

---

[2]Since defendant and his brother share the same last name we refer to defendant's brother by his first name.

¶ 26                    J. Chicago Police Sergeant John Foster

¶ 27          Sergeant John Foster testified that he was assigned to Marie's case on July 4, 2007. On August 24, 2007, he received information from defendant's brother's brother-in-law, which caused Foster to look for defendant as a suspect. On August 31, 2007, Sergeant Foster met with Jessica Ford, who identified defendant from a six-photo array. On September 17, 2007, Sergeant Foster met with DeEdna Porter, who also identified defendant from the same photo array. In November 2007, Sergeant Foster discovered that defendant had a son, and he obtained a buccal swab from the son which was sent to the Illinois State Police crime lab. In May 2008, after receiving the results of the DNA test, Sergeant Foster obtained an arrest warrant for defendant.

¶ 28          Sergeant Foster testified that he met defendant at the Los Angeles County jail on the morning of June 21, 2008. Defendant was advised of his *Miranda* rights, and indicated that he understood his rights and agreed to speak with the detectives. Defendant admitted that he went to Marie's apartment on July 4, 2007, at 4:30 p.m. He stated that Marie was a friend and that the two had sex. Defendant stated that another man, whom he believed to be Marie's boyfriend, entered the apartment. Defendant described the other man as a 20-year-old black man with a dark complexion, 5 feet 7 inches to 5 feet 8 inches tall, and 150 to 160 pounds. The two men immediately engaged in a physical altercation, and the other man cut defendant's hand with a knife. Defendant attempted to exit through the bedroom window, but the window was locked. Marie gave him a towel for his hand and then distracted the other man while defendant exited through the back door. At first, defendant stated that he went to the hospital at 8 p.m. on July 4, 2007. However, when Foster stated that he knew that defendant had reported the robbery as occurring at 9:30 p.m., defendant said he was not

sure what time he went to the hospital. Defendant stated that he reported a bike robbery to avoid bringing police attention to Marie's apartment.

¶ 29    After defendant was transported back to Chicago, he was identified in a lineup by Jessica Ford, DeEdna Porter, and Korderro Green. All three witnesses separately identified defendant as the man whom they observed on July 4, 2007.

¶ 30    K. Quiana Foster, the Victim's Daughter

¶ 31    Quiana Foster, Marie's daughter, testified that she identified her mother's body at the medical examiner's office, and that the last time she observed her mother alive was on July 3, 2007. On cross-examination, defense counsel asked Foster if Marie was a habitual drug user who "constantly had other drug users over to her home." Foster testified that she had no knowledge of this.

¶ 32    L. Maria Salazar, Forensic Biologist

¶ 33    The State's evidence also included the testimony of two expert witnesses who testified regarding the physical evidence recovered at the crime scene: (1) Maria Salazar, a forensic scientist specializing in forensic biology; and (2) Megan Neff, a forensic scientist specializing in DNA analysis.

¶ 34    Maria Salazar testified that she received the knife found next to Marie's body and the towel from Marie's kitchen. Both tested positive for the presence of blood. Salazar took two swabs from the knife, one from the handle and one from the blade. She also took a cutting from each of two bloodstains on the towel.

¶ 35    During cross-examination, defense counsel asked:

"Q. And when a case comes into your lab, there might be numerous pieces of

evidence, 10, 20, 30, a hundred, right?

A. Yes.

Q. And you don't necessarily test every single piece of evidence right off the bat, right?

A. No, we don't.

Q. In a case like this, a homicide case, usually there's something conducted called a case review, right?

A. Yes. We do case reviews if there's a lot of evidence that needs to be sorted through and discussed.

Q. And a case review is where scientists in your lab sit down with Chicago Police Officers, sometime prosecutors, but often times just police officers, and decide this is the evidence that we want to test first, this is evidence that we are not going to test, right?

A. Yes.

Q. And based on that, somebody forwards the evidence to you that your lab and some police officers have decided this is worth our time and we are doing testing on, right?

A. Yes. They choose what pieces of evidence we are going to start with in our analysis.

Q. And how do you find out from that case review meeting what piece of evidence you're actually going to do your Kastle-Meyer[3] on?

A. There are typically notes that are taken during that case review.

---

[3]The Kastle-Meyer test is a presumptive blood test.

Q. And then you get to see those notes and then from that you know which pieces of evidence to test?

A. Correct."

Defense counsel then asked Salazar if specific pieces of evidence were tested for blood evidence. Salazar stated that she tested only the knife and towel. Defense counsel asked:

"Q. And that is because as a result of this case management meeting with lab personnel and Chicago Police Officers, no one decided to do that, right?

A. Yes. There were some things that were prioritized in that meeting."

¶ 36    On redirect examination, the State asked:

"Q. Ms. Salazar, why is it that the Illinois State Police Crime Lab has the major case review? Why does it have that process?

A. We have the major case reviews because many times in a case like a homicide there is a lot of evidence and we need to narrow down what we are going to start with in the lab, what's going to have analysis done first.

Q. And with respect to items that are not analyzed, who can request that those items be analyzed?

A. We take requests from the submitting agency or any of the attorneys that are involved with the case."

Defendant objected to the last question, on the ground that it was burden-shifting. The trial court overruled defendant's objection.

¶ 37                         M. Megan Neff, DNA Analyst

¶ 38    Megan Neff, a forensic scientist specializing in DNA analysis, testified that she had analyzed the samples from the knife and towel. The knife blade and handle each had two

profiles, a major human female profile which matched Marie, and a minor human profile. The minor profile was too incomplete for any comparison other than exclusion. The first cutting from the towel had a human male DNA profile. Neff testified that the profile matched defendant's DNA profile, and that the profile would be expected to occur in approximately 1 in 510 quadrillion unrelated blacks. The second cutting from the towel had a major human DNA profile and a minor human DNA profile. Marie was excluded from having contributed to the major profile, but could not be excluded from having contributed to the minor profile. Defendant could not be excluded from having contributed to the major profile. Neff testified that 1 in 75 quadrillion unrelated blacks would be expected not to be excluded by the sample.

¶ 39    On cross-examination, defense counsel asked Neff if hairs were preserved for testing. Ness testified that she had not received any hair. Neff also testified that the knife and towel were the only items that she received for DNA testing.

¶ 40    On redirect examination, the State asked Neff "who can request items be analyzed for DNA purposes?" Defense counsel objected, stating "same objection," but the trial court overruled the objection. Neff replied that "anyone involved in the case can request the testing. The submitting agency can request it, or the State's Attorney's Office, or the Defense Attorney's Office."

¶ 41    On recross-examination, defense counsel asked if the Illinois State Police employed Neff. Neff clarified that the State of Illinois is her employer, but that she worked for the State Police. Defense counsel then asked if police and prosecutors had forms to request evidence testing while defense attorneys had no similar form. Neff testified that she had received

forms from police and prosecutors, but never from defense attorneys. However, she testified that she had received evidence from defense attorneys before.

¶ 42 After the close of the State's case, defendant moved for a directed verdict, which the trial court denied.

¶ 43                          N. Jamie Jett, Defense Witness

¶ 44 Defendant called Jamie Jett to testify as an expert in microscopy and hair comparison. Jett testified that hair had been discovered on Marie's hands, and that the hair did not match defendant. Jett testified that in 98% of cases where hair was found on a victim, that hair belonged to the victim.

¶ 45 Defendant exercised his right not to testify, and rested his case.

¶ 46                          II. Closing Arguments

¶ 47 Prior to closing arguments, the trial court informed the jury that "what the lawyers say during these closing arguments is not evidence and should not be considered evidence by you." After the State delivered its initial closing argument, defense counsel delivered her closing, stating in relevant part:

> "DEFENSE COUNSEL: [Sergeant Foster's] interpretations are designed to manipulate you. There was all sorts of scientific evidence in this case. It is unconscionable the prosecution is asking you to speculate about that evidence. But what is even more unconscionable is that they tried to manipulate and mislead you.
>
> THE STATE: Objection.
>
> THE COURT: Sustained. [Defense counsel], no personal attacks.

DEFENSE COUNSEL: What is more unconscionable is that in the Detective's testimony he tried to mislead you about the results of some of that scientific evidence.

When the prosecution elicited from Detective Foster that after learning of the fingerprint reports, that the prosecution elicited from the Detective that he knew there had been fingerprints, they tried to do fingerprint testing. Then they asked him, after learning about those reports, did you eliminate [defendant] as a suspect. The detective said no. That was designed to make you believe—

THE STATE: Objection.

THE COURT: Immaterial. Sustained. Move on, [defense counsel].

DEFENSE COUNSEL: The way in which the Detective described that testimony was in order to create speculation and assumption that [defendant]—

THE STATE: Objection, Judge.

THE COURT: Sustained. Move on, [defense counsel]."

Defense counsel continued her closing argument:

"[Defendant] told you Marie used drugs and that various people were in and out of her house. Her own daughter, who, of course, did not want to admit and was reluctant to admit here in court she knew and told Detectives that her mother was a chronic drug user. This is corroborated by the Medical Examiner. The Medical Examiner told you that she had cocaine in her system that night, which evidenced recent use of cocaine. And that she had benzoylecgonine, metabolites of cocaine in her system, which exhibited older use of cocaine.

Not only did Quiana say that her mother was a habitual drug user, but the people she allowed in her home were as well. She was a habitual drug user and she constantly had other drug users over in her home.

Korderro described that very day, that some might find outrageous. In the front room using drugs. Smoking marijuana. Girl in the back bedroom with a person he believed to be [defendant], not knowing what's going on. Not wanting to barge in. Some people find that outrageous. But that was Marie's life and the life she was living.

Now, we are not judging her, or the way she lived. And I certainly do not mean to minimize in any way what happened to Marie. It was a horrible, violent, tragic death that Marie should not have suffered. Many people, though, had access to Marie. She did not discriminate about who she let into her home. She allowed all sorts of people into her home.

Sadly, she allowed her killer into her home."

¶ 48    The State then began its rebuttal argument, stating:

"Today is July 1st. When we get to July 4th, we'll be on the 6th anniversary of Marie's death.

The defense asks how dare they. The defense looks to police the prosecution, and they say how dare they.

Well, how dare he tell us these absurd stories and think we'll be so gullible we'll be fooled.

The defense takes issue with all of the People's evidence. The Detectives follow the evidence, where it led them. And it led them to this Defendant. The

14

defense doesn't want you to look at the evidence. They want you to guess, assume, speculate.

There is one side in this case they want you to use your head. And there is one side in this case that wants you to use a cold heart when deciding the facts.

It is our burden. My partner and I welcome that burden. In this case we have proved beyond a reasonable doubt that he killed Edna Marie Smith. The man that killed her is sitting right at that table."

The State continued, describing the evidence against defendant:

"THE STATE: There is one side in this case that wants you to look at all the evidence and use your head. There is another side in this case that wants you to decide this case with a cold heart.

Why was Quiana Foster being questioned about her Mom's drug use. Why was Sammie Smith being question about [*sic*] he wasn't living with his wife any more. Why did they ask those questions. Was Edna Marie Smith, was her life any less pressing than anybody else's.

DEFENSE COUNSEL: Objection

THE COURT: Overruled. Ladies and gentlemen, you are allowed to make reasonable inferences from the evidence.

THE STATE: Make no mistake. Nothing. Nothing that happened in Edna Marie Smith's life, nothing she ever did, nothing, justifies what happened to her in that apartment.

He is guilty beyond a reasonable doubt. He is guilty. He is the one that did this. The Defendant in this case is guilty because the evidence tells you he is guilty."

¶ 49    On the first day of jury deliberations, the jury sent a note stating that the jurors were unable to come to a unanimous decision. The note stated that the jury was split with nine jurors in favor of a guilty verdict, and three jurors in favor of a not guilty verdict. The trial court told the jury to continue its deliberations. The trial court sequestered the jury, and the jury continued to deliberate the next day.

¶ 50    During the second day of deliberations, the jury sent another note stating that it was still split with nine jurors in favor of a guilty verdict. The trial court instructed the jury to continue its deliberations. Two hours and thirty minutes later, the jury returned a verdict finding defendant guilty of first-degree murder.

¶ 51                                    III. Sentencing

¶ 52    The trial court ordered a presentence investigation report prepared, which indicated that defendant was raised by his maternal grandparents after his father murdered his mother. Defendant graduated from high school in 1981 and enlisted in the United States Army in 1984. Defendant was honorably discharged in 1992. From 1993 to 2005, he was employed by the United States Postal Service.

¶ 53    During his allocution, defendant stated he was "sorry about all of this stuff that has happened." However, he stated that "not all of this stuff happened" and that he would never have murdered Marie.

¶ 54    The trial court sentenced defendant to 35 years in the Illinois Department of Corrections. The trial court considered the evidence presented at trial, the information in the presentence

investigation report, and defendant's allocution. The trial court also considered statutory factors in aggravation and mitigation, as well as the financial impact of incarceration. The trial court noted the dichotomy of defendant:

"On the one hand through mitigation and through the presentence investigation report, we see an individual who is now 50 years old, a Calumet high school graduate, military service, has been employed with the United States post office, no criminal history. We had a person of—Swan, a cousin testified on his behalf as to the attributes that are positive during his contact with [defendant].

And juxtapose that with the same 50 year old man who has been convicted by a jury of his peers of brutally stabbing multiple times literally butchering Edna [Marie] Smith.

It boggles this court's mind as to the kind of hate that can be bottled in one's being or the type of hatred that can boil up in one's blood that could cause one human being in this case, [defendant]. To do that to another human being, Ms. Edna [Marie] Smith.

***

But at the end of the day, the Court must consider all this and fashion an appropriate sentence. This is a brutal stabbing, a brutal murder. Edna [Marie] Smith was butchered in her own home at the hands of [defendant].

So sentencing that needs to be imposed here is a sentence that needs to address the crime and also to deter others from engaging in similar senseless behavior."

¶ 55     The 35 year sentence was 15 years greater than the minimum sentence of 20 years, and 25 years less than the maximum sentence of 60 years. Defendant moved for the trial court to reconsider his sentence, but the trial court denied his motion. This appeal follows.

¶ 56                                    ANALYSIS

¶ 57     On this direct appeal, defendant claims: (1) that the State impermissibly shifted the burden of proof onto defendant by eliciting testimony from its expert witnesses that defendant could have requested evidence to be tested; (2) that the State committed misconduct by attacking defense counsel's integrity during its closing and rebuttal arguments; and (3) that defendant's sentence of 35 years was excessive.

¶ 58     For the following reasons, we do not find these claims persuasive and affirm.

¶ 59                              I. Burden Shifting

¶ 60     Defendant argues that the State improperly shifted the burden of proof by eliciting testimony from its expert witnesses that defendant could have requested forensic tests on untested crime scene evidence. Forensic investigators had obtained swabs of apparent bloodstains from multiple areas in Marie's apartment, including a window ledge, but the blood on the window ledge, as well as other areas, was not tested. During cross-examination of the State's expert witnesses, defendant asked about the case management process which determined what pieces of evidence would be tested. On redirect examination, the State elicited testimony regarding who could request evidence to be tested. Specifically, Maria Salazar, a forensic biologist, stated: "[w]e take requests from the submitting agency or any of the attorneys that are involved with the case"; and Megan Neff, a DNA analyst, stated: "Anyone involved in the case can request the testing. The submitting agency can request it,

18

or the State's Attorney's Office, or the Defense Attorney's Office." Defendant objected in both instances to the State's questions, but the trial court overruled the objection.

¶ 61   "[E]videntiary rulings, such as the one presented by this case, are within the sound discretion of the trial court and should not be reversed absent an abuse of discretion." *People v. Bakr*, 373 Ill. App. 3d 981, 986 (2007). This is true even where the evidentiary ruling "depended upon a question of constitutional law." *Bakr*, 373 Ill. App. 3d at 986. " 'An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Bakr*, 373 Ill. App. 3d at 986 (quoting *People v.Caffey*, 205 Ill. 2d 52, 89 (2001)).

¶ 62   Defendant is correct that "[t]he defense is under no obligation to produce any evidence, and the prosecution cannot attempt to shift the burden of proof to the defense." *People v. Beasley*, 384 Ill. App. 3d 1039, 1047-48 (2008). "Courts have found error where the prosecution implied that the defendant had an obligation to come up with evidence to create a reasonable doubt of his guilt." *Beasley*, 384 Ill. App. 3d at 1048.

¶ 63   However, "a defendant cannot ordinarily claim error where the prosecutor's remarks are in reply to and may be said to have been invited by defense counsel's argument." *People v. Dixon*, 91 Ill. 2d 346, 350-51 (1982). In *Dixon*, for example, the defendant argued that the State had shifted the burden of proof by asking in its closing argument " '[d]id you hear any testimony whatsoever of what was going on in [defendant's] mind?' " *Dixon*, 91 Ill. 2d at 350. However, the Illinois Supreme Court determined that the prosecutor's remark "was proper rebuttal invited by defense counsel's argument and was not made for the purpose of calling attention to the defendant's failure to testify." *Dixon*, 91 Ill. 2d at 351.

¶ 64        In *People v. Patterson*, 217 Ill. 2d 407, 445-46 (2005), the defendant had, while cross-examining the State's expert witness, pointed out that the witness had not had his DNA analysis reviewed by an independent laboratory. The defendant in *Patterson* argued that the State then shifted the burden of proof by using redirect examination to ask the expert whether the DNA sample was " 'available for review and retesting by the state or by the defense.' " *Patterson*, 217 Ill. 2d at 446. The Illinois Supreme Court, citing *Dixon*, held that "[t]he purpose of the State's questioning on redirect, which was invited by defense counsel's questioning on cross-examination, was to answer the doubts raised by that cross-examination," and that "[i]n such situations, error cannot normally be claimed." *Patterson*, 217 Ill. 2d at 446 (quoting *Dixon*, 91 Ill. 2d at 350-51).

¶ 65        Defendant is also correct that "a defendant in a criminal case can never 'open the door' to shift the burden of proof." *Beasley*, 384 Ill. App. 3d at 1048. However, when "[t]he purpose" of the State's comments is not to shift the burden of proof, but to respond to the defendant's argument, error cannot normally be claimed. *Patterson*, 217 Ill. 2d at 446; *Dixon*, 91 Ill. 2d at 351. In the present case, the purpose of the State's comments was to address concerns about the case management process raised when defendant cross-examined the State's expert witnesses about the process. Defendant opened the door to the State's response, and error cannot be claimed.

¶ 66        Defendant relies on *Beasley*[4] for the proposition that the State cannot "impl[y] that the defendant had an obligation to come up with evidence to create a reasonable doubt of his guilt." *Beasley*, 384 Ill. App. 3d at 1048. However, the present case is distinguishable from

---

[4]Defendant also cites two cases from other jurisdictions, *Hayes v. State*, 660 So. 2d 257 (Fla. 1995) and *People v. Clark*, 214 P.3d 531 (Colo. App. 2009). However, *Patterson* is an Illinois Supreme Court decision factually similar to the present case, and we are bound by its holding. We need not consider cases from other jurisdictions.

*Beasley.* In *Beasley*¸ the appellate court found error when the State, in its closing argument, stated:

> " 'If \*\*\* it's unconscionable on the part of [the State not to test certain items for fingerprints,] it's just as unconscionable on the part of the defense. So, if you want something tested, you can get it tested. You can't sit back and say, "Well, nobody tested it; therefore, the evidence fails." ' " *Beasley*, 384 Ill. App. 3d at 1048.

Since a defendant has no burden of proof, "[a] defendant's failure to submit evidence for analysis cannot be considered 'unconscionable.' " *Beasley*, 384 Ill. App. 3d at 1048. By describing the defendant's failure to submit evidence as "unconscionable," the State implied that the defendant had a burden of proof. See *Beasley*, 384 Ill. App. 3d at 1048.

¶ 67 In the present case, however, the State did not describe defendant's omission as unconscionable. The State elicited testimony showing that evidence was being stored and could be tested by any party involved with the case. The apparent purpose was to address evidentiary concerns raised during cross-examination by defendant.

¶ 68 Furthermore, the *Patterson* court noted that "[t]he State's reference to the availability of the DNA samples to the defense was brief and was not repeated." *Patterson*, 217 Ill. 2d at 446. The court also noted that during closing argument, defense counsel "argued forcefully that the burden of establishing guilt remains at all times with the State." *Patterson*, 217 Ill. 2d at 446. In the current case, the references to the availability of the samples was likewise brief, and not repeated. Moreover, the State used its closing argument to explicitly state that it had the burden of proof. These details make the present case more similar to *Patterson* than to *Beasley*.

¶ 69       Defendant argues that *Patterson* is distinguishable, because in *Patterson* the testimony concerned the ability to retest evidence while in the present case the testimony concerned the ability to test evidence for the first time.   Defendant argues that it is more prejudicial to suggest that a defendant should test evidence than it is to suggest that a defendant should retest evidence.   However, the *Patterson* court found that the "purpose of the State's questioning on redirect *** was to answer the doubts raised by [the] cross-examination," and the State did not shift the burden of proof.  *Patterson*, 217 Ill. 2d at 446.  *Patterson* did not involve a case where the State shifted the burden of proof and the court had to determine the amount of prejudice caused by suggesting that the defendant retest evidence.  Likewise, in the current case, the State's apparent purpose was to answer doubts raised by the cross-examination, and *Patterson* is controlling.

¶ 70       For the foregoing reasons the State's questioning of Salazar and Neff did not constitute error.

¶ 71                              II. The State's Rebuttal Closing

¶ 72       Defendant's second argument is that the State's remarks during its rebuttal closing constituted reversible error.

¶ 73                              A. Standard of Review

¶ 74       It is not clear whether the appropriate standard of review for this issue is *de novo* or abuse of discretion.  We have previously made this same observation in several cases, including *People v. Alvidrez*, 2014 IL App (1st) 121740, ¶ 26; *People v. Land*, 2011 IL App (1st) 101048, ¶¶ 149-51; and *People v. Phillips*, 392 Ill. App. 3d 243, 274-75 (2009).  The Second District Appellate Court has agreed with our observation that the standard of review for

closing remarks is an unsettled issue. *People v. Burman*, 2013 IL App (2d) 110807, ¶ 26; *People v. Robinson*, 391 Ill. App. 3d 822, 839-40 (2009).

¶ 75 Our supreme court has held: "Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*." *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007). However the supreme court in *Wheeler* cited with approval *People v. Blue*, 189 Ill. 2d 99 (2000), in which the supreme court had previously applied an abuse of discretion standard. *Wheeler*, 226 Ill. 2d at 121. In *Blue* and numerous other cases, our supreme court had held that the substance and style of closing argument is within the trial court's discretion, and will not be reversed absent an abuse of discretion. *Blue*, 189 Ill. 2d at 132 ("we conclude that the trial court abused its discretion" by permitting certain prosecutorial remarks in closing); *People v. Caffey*, 205 Ill. 2d 52, 128 (2001); *People v. Williams*, 192 Ill. 2d 548, 583 (2000); *People v. Armstrong*, 183 Ill. 2d 130, 145 (1998); *People v. Byron*, 164 Ill. 2d 279, 295 (1995). Our supreme court has reasoned: "Because the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks, the scope of closing argument is within the trial court's discretion." *People v. Hudson*, 157 Ill. 2d 401, 441 (1993). Following *Blue* and other supreme court cases like it, this court had consistently applied an abuse of discretion standard. *People v. Tolliver*, 347 Ill. App. 3d 203, 224 (2004); *People v. Abadia*, 328 Ill. App. 3d 669 (2001).

¶ 76 Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review. *Alvidrez*, 2014 IL App (1st) 121740, ¶ 26 (noting that the issue remains divided). The first and third divisions of the First District have applied an abuse of discretion standard, while the Third and Fourth Districts and the fifth division of the First District have applied a

*de novo* standard of review. Compare *People v. Love*, 377 Ill. App. 3d 306, 316 (1st Dist. 1st Div. 2007) and *People v. Averett*, 381 Ill. App. 3d 1001, 1007 (1st Dist. 3d Div. 2008) with *People v. McCoy*, 378 Ill. App. 3d 954, 964 (3d Dist. 2008), *People v. Palmer*, 382 Ill. App. 3d 1151, 1160 (4th Dist. 2008), and *People v. Ramos*, 396 Ill. App. 3d 869, 874 (1st Dist. 5th Div. 2009). However, we do not need to resolve the issue of the appropriate standard of review at this time, because our holding in this case would be the same under either standard.

¶ 77                                                    B. Forfeiture and Plain Error

¶ 78        On this appeal, defendant challenges remarks made by the prosecution at both the beginning and the end of the State's rebuttal argument. However, at trial, defendant objected only to the remarks made at the end of the State's rebuttal argument. "To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion." *Wheeler*, 226 Ill. 2d at 122. Even when defendant has forfeited review of statements by failing to object, closing arguments must still be viewed in their entirety, and any "challenged remarks must be viewed in context." *Wheeler*, 226 Ill. 2d at 122. The "fact that defendant did not properly object to a statement does not render that statement as if it never existed. Indeed, all statements must be considered as part of the entirety of a prosecutor's closing argument, and even statements not properly objected to may add to the context of a remark properly objected to." *Wheeler*, 226 Ill. 2d at 123.

¶ 79        Defendant asks us to review the beginning of the State's rebuttal argument under the plain error doctrine. "[T]he plain-error doctrine bypasses normal forfeiture principles and allows a reviewing court to consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the

closeness of the evidence." *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). Under the plain error doctrine, we first consider whether there was error, because "only if there was error can the defendant plausibly argue that the error prejudiced him in a close case." *Herron*, 215 Ill. 2d at 187.

¶ 80                                          C. Propriety of Rebuttal Closing

¶ 81        Defendant argues that the State's rebuttal closing argument was improper and prejudicial. Defendant claims that the State: (1) accused defense counsel of wanting the jury to ignore the evidence; (2) accused defense counsel of mistreating witnesses; and (3) accused defense counsel of devaluing Marie's life.

¶ 82        To determine if comments made during closing argument constitute misconduct, a reviewing court "asks whether or not the comments engender substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123. "If the jury could have reached a contrary verdict had the improper remarks not been made, or the reviewing court cannot say that the prosecutor's improper remarks did not contribute to the defendant's conviction, a new trial should be granted." *Wheeler*, 226 Ill. 2d at 123. Our supreme court has stated that "a criminal defendant, regardless of guilt or innocence, is entitled to a fair, orderly, and impartial trial." *Wheeler*, 226 Ill. 2d at 121-22. For this reason, the court has an "intolerance of prosecutorial misconduct." *Wheeler*, 226 Ill. 2d at 122.

¶ 83        "A prosecutor cannot use closing argument simply to 'inflame the passions or develop the prejudices of the jury without throwing any light upon the issues.' " *Wheeler*, 226 Ill. 2d at 128-29 (quoting *People v. Halteman*, 10 Ill. 2d 74, 84 (1956)).

¶ 84     However, "[p]rosecutors are afforded wide latitude in closing argument." *Wheeler*, 226 Ill. 2d at 123. Furthermore, " '[i]mproper remarks in closing argument will not constitute reversible error unless they result in substantial prejudice to the defendant.' " *People v. Suane*, 164 Ill. App. 3d 997, 1004 (1987) (quoting *People v. Williams* 127 Ill. App. 3d 231, 234 (1984)).

¶ 85     In the instant case, defendant argues that the following remarks made by the State were improper:

> "The defense doesn't want you to look at the evidence. They want you to guess, assume, speculate.
>
> There is one side in this case they want you to use your head. And there is one side in this case that wants you to use a cold heart when deciding the facts.
>
> * * *
>
> There is one side in this case that wants you to look at all the evidence and use your head. There is another side in this case that wants you to decide this case with a cold heart.
>
> Why was Quiana Foster being questioned about her [m]om's drug use[?] Why was Sammie Smith being questioned about [*sic*] he wasn't living with his wife any more[?] Why did they ask those questions[?] Was Edna Marie Smith, was her life any less pressing than anybody else's[?]"

At trial, the defense objected only to the last of these remarks. The objection was overruled by the trial court.

¶ 86     On appeal, defendant argues that this statement improperly disparaged defense counsel's integrity by arguing that defense counsel was attempting to mislead the jury and wanted it to

ignore the evidence. Statements are improper when a prosecutor in closing arguments " 'suggest[s] that defense counsel fabricated a defense theory, attempted to free his client through trickery or deception, or suborned perjury.' " *People v. Kidd*, 147 Ill. 2d 510, 542 (1992) (quoting *People v. Emerson*, 97 Ill. 2d 487, 497 (1983)). However, the State's closing argument did not suggest that defense counsel fabricated a theory or was attempting to free defendant through trickery or deception. The State sought to remind jurors that this was not a referendum on the propriety of the victim's life but a trial on the question of who murdered her.

¶ 87    Defendant also argues that the State's closing argument accused defense counsel of mistreating the State's witnesses. However, after reviewing the record, we found no instances where the State made such an accusation.

¶ 88    Finally, defendant argues that the State accused defense counsel of discounting the value of Marie's life. Defendant claims that by posing hypothetical questions to the jury regarding defense counsel's motives in cross-examining Quiana Foster and Sammie Smith, the State shifted attention to the tactics and objectives of defense counsel.

¶ 89    Our supreme court has granted a new trial when the State " 'improperly shift[ed] the focus of attention from the evidence in the case to the objectives of trial counsel.' " *Kidd*, 147 Ill. 2d at 544 (quoting *Emerson*, 97 Ill. 2d at 498). In *Kidd*, the State accused defense counsel of fabricating a " 'smoke screen' " to confuse the jury. *Kidd*, 147 Ill. 2d at 542. The supreme court determined that the State's closing argument was:

> "highly inappropriate and extremely prejudicial for two reasons. First, the assistant State's Attorney did not make just one fleeting, inadvertent remark regarding this 'smoke screen' metaphor. Rather, he commented *eight times ***.*

27

*** Second, given that this was an arson case—10 children perished in fire which defendant is accused of starting—we believe that by repeatedly returning to his 'smoke screen' theme *** the assistant State's Attorney only inflamed the prejudices of the already emotionally charged jurors." (Emphasis in original.) *Kidd*, 147 Ill. 2d at 543-44.

¶ 90    In *Wheeler*, another case in which the supreme court ordered a new trial in light of prejudicial statements during closing argument, the supreme court noted that the prosecutor "did not make a few solitary improper remarks." *Wheeler*, 226 Ill. 2d at 131. Instead, the closing argument contained a "theme [that] was built piece by piece and is evident from the very beginning." *Wheeler*, 226 Ill. 2d at 131. Additionally, the *Wheeler* court found "that a chief goal of the prosecutor's closing argument in this case was to inflame the passions and prejudices of the jury." *Wheeler*, 226 Ill. 2d at 130.

¶ 91    In the instant case, the State did not create a "theme" of disparaging defense counsel. The State instead made "a few solitary" remarks concerning defense counsel's motives. *Wheeler*, 226 Ill. 2d at 131. Additionally, the purpose of these questions was not to "inflame the passions and prejudices" of the jury. *Wheeler*, 226 Ill. 2d at 130. While such remarks push the envelope and are " 'better left unsaid, they are hardly of sufficient magnitude to justify a reversal.' " *Suane*, 164 Ill. App. 3d at 1004-05 (quoting *People v. Williams*, 127 Ill. App. 3d 231, 234 (1984)).

¶ 92                                    III. Sentencing

¶ 93    We review the sentence imposed by the trial court under an abuse of discretion standard. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). This means that "[t]he appellate court defers to the trial court's decisions concerning sentencing and presumes that the trial court

considered only appropriate factors in sentencing, unless the record affirmatively shows otherwise." *Quintana*, 332 Ill. App. 3d at 109.

¶ 94     Sentencing "requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *Quintana*, 332 Ill. App. 3d at 109.   "The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record, and the statute does not mandate that the absence of aggravating factors requires the minimum sentence be imposed." *Quintana*, 332 Ill. App. 3d at 109.

¶ 95     Defendant argues that when the trial court sentenced him to 35 years in prison, a sentence 15 years greater than the minimum, the court did not adequately consider mitigating factors. However, the record shows that the trial court specifically considered a range of mitigating factors including defendant's age, scholastic achievements, military service, employment, and lack of criminal record.   The trial court described these characteristics as part of "a dichotomy" in defendant.

¶ 96     The trial court then described the seriousness of defendant's crime, describing defendant as a "50 year old man who has been convicted by a jury of his peers of brutally stabbing multiple times[,] literally butchering[,] Edna Smith."   The trial court explained that the sentencing needed to address the brutality of the crime and "deter others from engaging in similar senseless behavior."

¶ 97     "The seriousness of the crime is the most important factor in determining an appropriate sentence ***." *Quintana*, 332 Ill. App. 3d at 109.   Here, the crime was a murder, and the

29

trial court found that it was done in a brutal and deliberate fashion. Furthermore, the trial court not only expressly considered mitigating factors in defendant's favor, but gave defendant a sentence 25 years less than the maximum. The trial court did not abuse its sentencing discretion by sentencing defendant to 35 years.

¶ 98                                    CONCLUSION

¶ 99      On this direct appeal, defendant claimed: (1) that the State impermissibly shifted the burden of proof onto defendant by eliciting testimony from its expert witnesses that defendant could have requested evidence to be tested; (2) that the State committed misconduct by attacking defense counsel's integrity during its closing and rebuttal arguments; and (3) that defendant's sentence of 35 years was excessive.

¶ 100      For the foregoing reasons, we do not find these claims persuasive and affirm.

¶ 101      Affirmed.