2021 IL App (1st) 181467-U
No. 1-18-1467
Order filed January 4, 2021

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 11478 |
| | ) | |
| TOYOUN HAMPTON, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Walker and Justice Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's seven-year sentence for aggravated domestic battery was not excessive given the seriousness of defendant's offense, his extensive criminal background, and his history of domestic violence.

¶ 2    Following a bench trial, Toyoun Hampton was convicted of one count each of domestic battery, aggravated domestic battery, and aggravated battery, and sentenced to concurrent prison terms of seven years for aggravated domestic battery and five years for aggravated battery. On appeal, Hampton argues that his seven-year sentence for aggravated domestic battery was excessive where the trial court failed to consider the applicable mitigating factors. We affirm.

¶ 3                                Background

¶ 4    Hampton was charged by information with one count each of domestic battery (720 ILCS 5/12-3.2(a)(1) (West 2016)), aggravated domestic battery (720 ILCS 5/12-3.3(a-5) (West 2016)), aggravated battery with a deadly weapon (720 ILCS 5/12-3.05(f)(1) (West Supp. 2015)), and attempt first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2016)), after an incident on July 16, 2016. The domestic battery, aggravated domestic battery, and attempt first degree murder counts alleged that Hampton strangled Seckia Fisher, while the aggravated battery count alleged that Hampton shot Fisher multiple times with a BB gun. The domestic battery count further alleged that Hampton had multiple convictions for domestic battery. The trial court granted the State's motion *in limine* to admit proof of other crimes as to four instances involving Fisher.

¶ 5    At trial, Fisher testified that she was in a relationship with Hampton for 15 years beginning in 2001 and had two sons with him. On October 5, 2010, Fisher and Hampton were in an "altercation" at their home, and Hampton grabbed Fisher by the neck, choked her, and punched her in the mouth. Fisher reported the incident. Fisher also reported an incident on June 19, 2011, in which Hampton similarly grabbed Fisher's collar and hit her lip with his hand. On August 2, 2013, Hampton pulled Fisher's hair and struck Fisher's daughter-in-law. Fisher called the police. While Fisher was on the phone, Hampton kicked open the back door to their home, "smacked" the phone out of Fisher's hand, stomped on the phone, kicked Fisher in the stomach, and hit Fisher in the head with a "boxed fan." Bleeding, Fisher went to the hospital, and received staples and stitches in her head. On June 27, 2016, Hampton punched and kicked Fisher. Following this experience, Fisher's father sent Fisher tickets to St. Louis, where she and her sons stayed for two weeks.

¶ 6    On July 15, 2016, Fisher lived with Hampton and their sons, then ages four and nine. That night, at 11:30 p.m., Hampton and Fisher were alone in Fisher's first-floor bedroom, and their sons were asleep upstairs. Hampton asked Fisher about a past relationship, and Fisher told Hampton about it. Hampton acted upset and "smacked" Fisher with an open hand once on each side of her face. Hampton continued to question Fisher, removed a BB gun from a dresser in the bedroom, and said he would "give [Fisher] a chance to tell the truth." Fisher began to speak, and Hampton shot Fisher in her left wrist and three times in her left leg.

¶ 7    Hampton then told Fisher they would talk in the basement "for more privacy." On the way there, Hampton grabbed Fisher's neck and choked her with both hands. When they reached the basement, Hampton fell and hit his head. Fisher helped Hampton onto a chair, and Hampton said he was "seeing things." Fisher led Hampton back upstairs into a second bedroom, "laid him down," and talked to him to make sure that he remained conscious.

¶ 8    About two hours later, in the early morning of July 16, Hampton and Fisher returned to Fisher's bedroom. Hampton got "angry" and "upset" again and repeatedly asked Fisher about her previous relationship. Fisher walked to the back door in the kitchen. Hampton also entered the kitchen, stood about 10 feet from Fisher, and continued to ask about Fisher's previous relationship. Then, Hampton choked Fisher with his hands around her neck and his thumbs pressed into the middle of her neck. Hampton yelled loudly with his eyes "real big," and Fisher had never seen him "that upset" before. Fisher fell unconscious.

¶ 9    Eventually, Fisher regained consciousness and stood up. Hampton grabbed her neck again, choked her in the same manner as before, and caused Fisher to lose consciousness a second time.

When Fisher woke, Hampton "kept saying 18, 18." Fisher and Hampton entered Fisher's bedroom, Hampton "calmed down," and they fell asleep at 6:24 a.m.

¶ 10 At about 9 a.m., Fisher woke, grabbed her four-year-old son, and ran into a nearby house. Fisher did not know the woman in the house but described the incident to the woman, who called the police. The police arrived, left to retrieve Fisher's older son from Fisher's house, and returned with him. Fisher was treated at a hospital, where a BB pellet lodged in her wrist was removed. Fisher's left leg and hip contained multiple BB pellets, none of which could be removed. She had bruises and choke marks in the shape of handprints on her neck.

¶ 11 The State entered the BB gun into evidence, as well as photographs taken at the hospital of Fisher's BB gun wounds and choke marks.

¶ 12 On cross-examination, Fisher denied that Hampton consumed drugs or alcohol before choking her or that she knew "why he was like that," but confirmed that Hampton was "acting irrationally" and "saying things that weren't true" in the early morning of July 16. Fisher confirmed that when Hampton entered the basement, he fell because his knees buckled, and he remained on the floor for about 30 seconds. After Fisher helped Hampton into the chair, Hampton asked, "Who is that man over there?" Fisher denied that Hampton jumped off his chair, dove to the basement floor, and punched the floor, although she had testified to these facts in a preliminary hearing. Rather, Fisher stated that Hampton struck an air mattress on the floor. When Hampton and Fisher left the basement and returned upstairs, Hampton's knees buckled again and he fell to one knee. Fisher confirmed that her nine-year-old son helped her move Hampton to the second bedroom and then returned to his room upstairs.

¶ 13    Fisher also confirmed that after Hampton choked her and they returned to Fisher's bedroom, Hampton stated, "numbers don't lie," and told Fisher to "look at project 624." Fisher explained that Hampton was looking at the clock, which stated it was 6:24 a.m., and that 624 was "the building we used to live in when we stayed in the projects." Fisher did not consider the statement to be irrational, but said it was unrelated to their discussion that night.

¶ 14    Chicago police officer Santiago testified that he and another officer responded to a "domestic disturbance" call in the late morning of July 16, and encountered Fisher, who was inside someone else's house. Fisher was shaking, and looked "nervous," "in distress," and "scared for her life." After speaking with her, Santiago went to Fisher's house and knocked on the door. Fisher's nine-year-old son ran outside and told Santiago he "need[ed] to go find [his] mother." Santiago asked the boy whether Hampton was inside, and he responded that Hampton was "in the bedroom." Other officers removed Hampton. Afterwards, Santiago entered Fisher's house with Fisher to recover Hampton's BB gun, which Santiago found in a closet and identified at trial.

¶ 15    On cross-examination, Santiago confirmed he saw Hampton walk out of a bedroom, and denied that Hampton appeared disoriented because he "looked fine" and "was walking."

¶ 16    The State submitted certified copies for Hampton's two domestic battery convictions from 2004 and 2013 as to the domestic battery count. The court also allowed the State's motion to admit the 2013 domestic battery conviction "for propensity evidence on proof of other crimes."

¶ 17    The trial court found Hampton guilty of domestic battery, aggravated domestic battery, and aggravated battery with a deadly weapon, and not guilty of attempt first degree murder. Hampton filed a posttrial motion, which the trial court denied.

¶ 18    Hampton's postsentencing investigation report (PSI) stated that as a juvenile, he was found guilty of robbery in 1998 and possession of a controlled substance in 2000. As an adult, Hampton was convicted of domestic battery in 2004, narcotic-related loitering in 2006, possession of a controlled substance in 2005 and 2009, and aggravated unlawful use of a weapon in 2009. The PSI did not list the 2013 domestic battery conviction that the State introduced at trial. The PSI also stated that Hampton belonged to the Gangster Disciples from age 13 to 23.

¶ 19    According to the PSI, Hampton reported that his mother was a "drug addict," his father was "constantly incarcerated," and his grandmother primarily raised him and his seven siblings. Hampton likened his childhood to a "rollercoaster ride," as he frequently was moved between the houses of his mother and grandmother and would see his mother consume drugs and suffer abuse from "various men." At the age of 13, Hampton left his grandmother's house and moved in with his 21-year-old girlfriend.

¶ 20    The PSI also stated Hampton was diagnosed with a learning disability in the seventh grade, and enrolled in a special education program. He left high school during his sophomore year due to lack of "supervision." Hampton was self-employed for four years in construction and remodeling. He reported "thinking about" obtaining a GED and studying architecture in college.

¶ 21    The PSI further indicated that Hampton has nine children from five different relationships, and provides financial assistance for all except one who lives in Iowa. He denied any history of domestic violence with his children and their mothers, excluding Fisher and her two sons. As to Fisher, Hampton reported that she was "often physically and verbally abusive towards him." Before Hampton's arrest, Hampton resided with Fisher, their two sons, and a daughter from Fisher's previous marriage in a neighborhood "infested with gang violence and criminal activity."

¶ 22    Hampton reported attempting to commit suicide twice at ages 15 and 20. At the time of the investigation, he was diagnosed with depression, prescribed anti-depression and sleeping aid medication, and received therapy. Hampton first drank alcohol at age 11, and consumed half a pint of cognac every weekend since age 21, cannabis from ages 15 to 25, and powder cocaine two or three times a month since age 23.

¶ 23    The State argued in aggravation that Hampton had multiple "prior instances of violence" against Fisher, and an "extensive history of violence against women." The State raised that Hampton could have killed Fisher when he twice choked her to the point of unconsciousness. The State argued that Hampton should receive a maximum term of seven years' imprisonment.

¶ 24    The defense argued in mitigation that Hampton was receiving group therapy, and "needs some help as far as how to behave toward other people and [e]specially the mother of his children here," but would "hopefully" receive that help in custody. The defense asked the court to "be lenient and consider [Hampton's] upbringing," as Hampton had "difficult issues" with his father and lacked the "paternal help to show [him] how to treat women and *** be a good father and *** husband." The defense did not suggest a specific sentence for Hampton, but asked the trial court to "do the best [it] can for [him]."

¶ 25    Hampton stated in allocution that he apologized to Fisher and "never had a mother or anyone to show [him] the true value of a woman." He further asserted that in jail, he had learned that "a person['s] only enemy is their inner self," and that "[y]ou have to love yourself before you can love anyone else." He stated, "[B]eing away from the things that I thought that I love made me know what love really truly is." Hampton promised to be "a better citizen, father, and spouse to the woman that's in my life right now."

¶ 26    The trial court merged Hampton's domestic battery count into his aggravated domestic battery count, and sentenced Hampton to concurrent prison terms of seven years for aggravated domestic battery and five years for aggravated battery. The court found that the "appropriate sentence" was "the maximum time that [it] can give."

¶ 27    Hampton filed a motion to reduce his sentence, alleging, in relevant part, that his sentence was excessive considering his "history, character and condition," and Fisher's recovery. The trial court denied Hampton's motion.

¶ 28                                    Analysis

¶ 29    On appeal, Hampton argues that his seven-year sentence for aggravated domestic battery was excessive where he demonstrated rehabilitative potential by expressing remorse in allocution and the trial court failed to consider his "personal history and emotional problems experienced during the offense." The State responds that nothing in the record rebuts the presumption that the trial court properly considered any applicable mitigating factors presented.

¶ 30    The proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors." (Internal quotation marks omitted.) *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94. "The trial court has broad discretionary powers in imposing a sentence," and it receives great

deference "because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the cold record." (Internal quotation marks omitted.) *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010).

¶ 31    Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) grants this court authority to reduce the sentence imposed by a trial court. But, a reviewing court "must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently." *Fern*, 189 Ill. 2d at 53. The trial court need not "recite all the mitigating and aggravating factors before imposing sentence." (Internal quotation marks omitted.) *People v. Spicer*, 379 Ill. App. 3d 441, 469 (2007). And there is a "strong presumption" that the trial court considered any mitigating evidence before it, unless the defendant can rebut that presumption by showing "some indication, other than the sentence imposed, that the trial court did not consider the mitigating evidence." *People v. Butler*, 2013 IL App (1st) 120923, ¶ 31.

¶ 32    A reviewing court may not alter a sentence absent an abuse of discretion by the trial court. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Where a sentence is within statutory limits, this court will only deem the sentence excessive and the result of an abuse of discretion "where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 33    Hampton challenges his seven-year sentence for aggravated domestic battery. Aggravated domestic battery is a Class 2 felony subject to a sentence of three to seven years. 720 ILCS 5/12-3.3(b) (West 2016); 730 ILCS 5/5-4.5-35(a) (West 2016).

¶ 34    We initially note that the most important factor in determining an appropriate sentence is the seriousness of the offense, and Hampton committed a serious and violent offense. *Kelley*, 2015

IL App (1st) 132782, ¶ 97. Namely, as the evidence at trial showed, Hampton had a long history of domestic violence towards Fisher. This violence escalated to the night of the incident in this case, in which Hampton struck Fisher in the face twice, shot her with a BB gun multiple times, and choked her three times, including twice to the point of unconsciousness. The conduct underlying Hampton's aggravated domestic battery conviction—Hampton's strangulation of Fisher—threatened Fisher's life and left choke marks on her neck. See 730 ILCS 5/5-5-3.2(a)(1) (West Supp. 2015) (sentencing court may consider in aggravation that "the defendant's conduct caused or threatened serious harm").

¶ 35     The trial court was additionally presented with the PSI, which showed that Hampton had an extensive criminal history, including convictions for possession of a controlled substance, unlawful use of a weapon, and domestic battery. The trial court was apprised of a second domestic battery conviction introduced at trial. See 730 ILCS 5/5-5-3.2(a)(3) (West Supp. 2015) (listing defendant's history of criminal activity as factor for sentencing courts to consider in aggravation). Further, the PSI reflected a history of regularly consuming alcohol, cannabis, and cocaine. See *People v. Montgomery*, 192 Ill. 2d 642, 674 (2000) (observing defendant's history of alcohol and drug abuse not necessarily mitigating and may be considered in aggravation); see also *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 105 (describing substance abuse as "double-edged sword" that may be considered as mitigating or aggravating factor (internal quotation marks omitted)).

¶ 36     Hampton argues that his maximum sentence in itself shows that the trial court did not consider the mitigating evidence presented at the sentencing hearing, namely, his expression of remorse and his difficult upbringing. But, Hampton cannot defeat this presumption by simply referring to the sentence imposed. *Butler*, 2013 IL App (1st) 120923, ¶ 31.

¶ 37    The evidence at the sentencing hearing showed continuous failure to conform to societal norms, given Hampton's extensive criminal background and long history of domestic violence.

¶ 38    Hampton also asserts that the trial court failed to consider that he "appeared to experience a mental health crisis during the offense," referring to the trial evidence that Hampton had fallen to the ground in the basement, appeared to hallucinate, and made cryptic statements later that night.

¶ 39    The State responds that Hampton failed to preserve this aspect of his claim, as it was never raised at the sentencing hearing. Hampton, however, filed a motion to reduce his sentence that alleged (i) his sentence was excessive, and (ii) the court failed to consider his "history, character and condition." This allegation apprised the trial court of Hampton's objection to the sentence. See *People v. Raymond*, 404 Ill. App. 3d 1028, 1070 (2010) (finding defendant preserved excessive sentence claim pertaining to consideration of his criminal history, where motion to reconsider his sentence argued sentence was "'excessive in view of the defendant's background'").

¶ 40    That said, we cannot find the trial court erred in failing to consider Hampton's apparent "mental health crisis" during the offense to the extent that it may have been relevant. The court heard the evidence regarding Hampton's mental state during the offense, as well as an extensive description in the PSI regarding Hampton's mental health issues.

¶ 41    This court has regarded mental health issues as a "double-edged sword," which the trial court is free to consider either in mitigation or aggravation. *Brunner*, 2012 IL App (4th) 100708, ¶¶ 64-66 (noting, circuit court not required to consider defendant's mental health issues as mitigating factor, and legislature has not listed mental health issues as mitigating factor in Unified Code of Corrections). The evidence did not show that Hampton's treatment of Fisher related to his apparent crisis. Rather, the evidence revealed a lengthy pattern of domestic violence on Fisher.

The evidence also showed that before Hampton fell and apparently experienced hallucinations, he had already struck Fisher in the face, shot her multiple times with a BB gun, and choked her on the way to the basement. The trial court was not required to consider Hampton's mental health issues on the night of the offense as a mitigating factor. Given the aggravating factors presented, we find that the trial court did not abuse its discretion by imposing the maximum possible sentence for Hampton's aggravated domestic battery conviction.

¶ 42    Affirmed.