2020 IL App (1st) 161223-U

No. 1-16-1223

Order filed December 21, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 8605 |
| | ) | |
| ADMON SHASHO, | ) | Honorable |
| | ) | Domenica A. Stephenson, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Walker and Justices Hyman concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's 18-year sentence for aggravated criminal sexual assault is affirmed over his contention the sentence is excessive. Where both counts of aggravated criminal sexual assault were based on a single act of penetration, one of the sentences on those counts must be vacated under the one-act, one-crime rule. We remand for the trial court to determine on which aggravated criminal sexual assault charge defendant should be sentenced. We also remand under Illinois Supreme Court Rule 472(e) in order that defendant may file a motion challenging his fines and fees if he so chooses.

¶ 2    Following a jury trial, defendant Admon Shasho was convicted of two counts of aggravated

criminal sexual assault and one count of attempt robbery. He was sentenced to concurrent terms of 18 years' imprisonment for the aggravated criminal sexual assault counts and a consecutive term of 4 years' imprisonment for the attempt robbery charge. On appeal, defendant argues (1) one of his aggravated criminal sexual assault convictions should be vacated under the one-act, one-crime rule; (2) his sentence of 18 years' imprisonment for aggravated criminal sexual assault is excessive; and (3) his fines and fees order should be corrected. We affirm in part and remand for further proceedings.

¶ 3     Defendant was charged with two counts of aggravated criminal sexual assault premised on his sexual penetration of R.H. on April 14, 2012, and with one count of attempt robbery of R.H.[1] Count 2 charged defendant committed aggravated criminal sexual assault when he inserted his finger into R.H.'s vagina by the use of force or threat of force and acted in such a way as to threaten or endanger her life by threatening to kill her (720 ILCS 5/11-1.30(a)(3) (West 2012)). Count 3 alleged he committed aggravated criminal sexual assault when he inserted his finger into R.H.'s vagina by the use of force or threat of force and committed the sexual assault during the course of his commission of another felony: attempt robbery (720 ILCS 5/11-1.30(a)(4) (West 2012)). The attempt robbery count alleged he took a substantial step toward the commission of robbery when he "grabbed" R.H.'s cellular phone and purse by use of force or threatening the imminent use of force (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/18-1(a) (West 2012)). As defendant does not challenge the sufficiency of the evidence sustaining his convictions, we recite only the facts relevant to our disposition.

---

[1] Defendant was initially charged with a third count of aggravated criminal sexual assault but the State nol-prossed the charge.

¶ 4      At trial, R.H. testified that on April 14, 2012, she was 21 years old and had spent the night going to bars in Chicago with friends. Walking home along Lincoln Avenue at 4:00 to 4:30 a.m., R.H. cut through an alley close to her home. She heard "someone panting behind" her, turned, and saw a man "six inches" from her face. She identified defendant in court as that man. She had never seen him before he approached her in the alley.

¶ 5      Defendant pushed R.H. to the ground and threatened to kill her if she said anything. R.H. screamed for help. Defendant placed his hand over her mouth and tried to take her phone from her. R.H. bit defendant on two of the fingers of that hand and his forearm. Defendant then pulled R.H.'s leggings down, and placed two fingers inside her vagina, which she felt because "[h]is nails started to hurt." R.H. screamed, causing a neighbor to come out, at which point defendant ran away. R.H. next saw defendant approximately 20 minutes later in a squad car when the police officers brought him so that she could identify him. R.H. then went to Illinois Masonic Hospital where she received treatment and underwent a rape kit test.

¶ 6      On cross-examination, R.H. stated that, when defendant confronted and pushed her, she told him she would give him $20 and to leave her alone. She then fought with him over her phone and bit him on the arm.

¶ 7      Camille Psenka testified she and her husband Ron Psenka were at home in their bedroom on April 14, 2012, between 4:00 and 4:30 a.m.[2] She heard loud voices in the alley, went to the window, and saw a "male figure" restraining someone. Camille heard "cries for help from a female voice" and yelled to the man to "stop and let the person go." The man continued restraining the

_____

         [2] As Camille Psenka shares the same last name as her husband, Ron Psenka, we will refer to these witnesses by their first names.

woman and Camille called the police. Camille went to get a baseball bat, but Ron went outside before she returned with it. When Camille went outside, she saw a woman, whom she came to know as R.H., on the ground crying. She gave R.H. her jacket and covered her up, because she was partially undressed. Camille never saw the face of the person who was struggling with R.H. in the alley.

¶ 8 Ron Psenka testified that, when he went outside, he saw a man on top of a woman, restraining her on the ground. Ron picked up a shovel from his yard and ran toward them, yelling at the man to get off the woman. The man, whom Ron identified in court as defendant, ran in the opposite direction. Ron verified the woman did not know defendant and then chased him into a park. Defendant stopped and picked up a branch. He told Ron the woman was his girlfriend and they had gotten into an argument. Ron ran to an approaching police car and gave the officers defendant's description and location. They arrested defendant.

¶ 9 Robert Kassinger testified that on April 14, 2012, he was woken up at 4:15 to 4:30 a.m. by "[s]ome very loud shouting and screaming from out the window." Looking down into the alley, Kassinger saw the back of a person with another person underneath, and heard a female voice saying "no, stop, stop doing this." Kassinger called 911 and ran to the alley where he saw Camille with a young woman, whom he knew as R.H.

¶ 10 Emergency room nurse Christina Swain testified she was working at Illinois Masonic Hospital on April 14, 2012, when she met with R.H. R.H. was crying, upset, and angry. She told Swain she had been attacked in an alley where a man forced her to the ground, pulled her pants down, and stuck his fingers inside her. Along with emergency room physician Dr. Julie Martino, Swain performed an examination and evidence collection for a criminal sexual assault kit. Dr.

Martino testified that, during her examination of R.H., she noted that R.H. had "dirt on her right labia majora, which is the opening of the vagina." R.H. also "had dirt on her upper back, an abrasion or a scratch to her right lower lip, and a scratch or abrasion to her nose."

¶ 11    An Illinois State Police forensic scientist testified an analysis of a swab taken from defendant's left hand contained both defendant's and R.H.'s D.N.A.

¶ 12    Chicago police officer Gilbert Lucio testified he and Officer Martha Gomez were on patrol in a marked SUV on April 14, 2012, responding to a criminal sexual assault in progress radio call. A man holding a shovel got their attention. Based on a conversation with the man, Lucio pursued another man running eastbound through Wells Park. Eventually Lucio stopped the man, whom he identified in court as defendant, and placed him in custody. R.H. subsequently identified defendant as the person who attacked her in the alley. The officers then arrested him and drove him to the police station. On the way there, they passed a taxicab parked at Lincoln Avenue and Sunnyside Avenue. Defendant stated the cab was his, and the officers retrieved his identification from the cab's glove compartment.

¶ 13    Detective Ed Heerdt testified defendant waived his *Miranda* rights and gave Heerdt a statement regarding the incident. Defendant stated he was "sorry about what happened," had been working as a "cab driver" for about 18 months, and his cab was not involved because he was off duty at the time. He told Heerdt he had just completed a shift when he saw a woman walking down the street. He followed her into an alley where he "cornered her." Defendant stated "he got greedy" and decided to take her purse and cell phone from her hand, but she fought him. Defendant told Heerdt he then tried to search her body for other property, pulled down her pants and underwear, and "for just a second, the incident became sexual." Defendant stated he placed the fingers of his

left hand inside the victim's vagina before he "got back to the business of the robbery," but was never able to take any of the victim's property.

¶ 14    Cook County assistant state's attorney Joseph Crocker testified defendant gave him a written statement on April 14, 2012. Crocker testified he reviewed the statement with defendant, took a picture of defendant with it, and defendant signed the bottom of each page. The statement was then published to the jury.

¶ 15    In the statement, defendant states he worked as a cab driver for Top Cab and was a current engineering student at "UIC." On April 14, 2012, he finished a shift around 4:00 a.m. and was traveling home when he saw "a girl" walking alone on Lincoln Avenue. He had driven several women earlier in the night who had been flirting with him, and when he saw the girl, he "saw an opportunity to encounter a woman who was alone, and he felt that exposed his own sexual vulnerability." Defendant approached her on foot "because of his sexual desires" but first tried to take her phone away.

¶ 16    After struggling with the girl, defendant put his hand over her mouth and "took the girl to the ground" where he pulled down her leggings and underwear. After defendant pulled down her leggings, he saw her vagina was exposed and decided to touch it. "[Defendant] saw the opportunity to express his sexual stresses of his job, that he had been building up all night while driving a taxi cab" and decided to put his fingers inside her vagina "for just a few seconds." Defendant threatened the girl telling her that "he had a knife to use if she would not be quiet." When a man with a shovel approached them, he ran away. The man chased him to a nearby park where he was arrested a short time later.

¶ 17    The court denied defendant's motion for a directed verdict.

¶ 18    Defendant put on three witnesses. Detective Neil Francis testified regarding his interviews with Camille, Kassinger, and R.H. He did not recall whether Camille told him that she saw R.H.'s pants pulled down, but recalled that she said she had covered R.H. up. When Francis spoke with R.H., she was "visibly upset," because she had "been traumatized, she'd been shaken up, but she was coherent." She did not appear intoxicated at the time.

¶ 19    Chicago police officer Martha Gomez testified she encountered Ron Psenka, and arrested defendant after he was positively identified by R.H. as the man who placed two fingers into her vagina. R.H. bit his hand. Tony Drake testified his family owned a taxi cab business and defendant was one of their cab drivers. Drake identified the taxi found at the scene as one of his family's cabs. When he retrieved the taxi on April 14, 2012, he saw the meter was running. Finally, the parties stipulated what Detective Regal would testify to regarding his interviews with Ron, R.H., and Camille.

¶ 20    The jury found the defendant guilty of attempt robbery and both counts of aggravated criminal sexual assault. The court denied defendant's motion for a new trial and *pro se* motion for ineffective assistance of counsel under *People v. Krankel*, 102 Ill. 2d 181 (1984). The case proceeded to sentencing.

¶ 21    At sentencing, defendant's presentence investigation report (PSI) indicated that he was born in 1984 in Bagdad, Iraq, and moved to the United States in 1997. He had two convictions for traffic violations and no prior felony convictions. Defendant stated he was raised by his mother and his childhood was "a struggle." His mother was verbally and physically abusive and a gambling addict who had "recently" stolen $30,000 from him. He blamed his state of mind at the time of the offense on the incident with his mother. In 2012, defendant was working as a cab driver

while a student at UIC studying industrial engineering. Defendant was a member of Park Community Church, regularly attended Sunday services, and volunteered there as a religious education teacher. He was close with his two sisters and brother. When asked to share his feelings about the crime, defendant stated "disbelief and embarrassed at first, but now I feel like I've paid my debt."

¶ 22      In aggravation, Detective Heerdt testified he had an additional conversation with defendant on April 14, 2012, in which defendant told him "this isn't the first time this has happened" and described two incidents. One incident occurred in October or November of 2010, when defendant attempted to take property from a woman. As he was searching her with his hands, "particularly her pants area," "it became sexual at some point." Defendant pulled down the woman's pants but then ran away. Another incident occurred in the summer of 2011, when he approached a woman, attempted to take property from her, and patted her down. On cross-examination, Heerdt stated he never spoke with either of the alleged victims and did not videotape or record defendant's statement.

¶ 23      R.H. read her victim impact statement, where she stated that she grew up in the neighborhood, and was always comfortable there, but after the attack she no longer felt the same about where she lived. She stated that she had panic attacks and her "anxiety overwhelms [her]," and had turned down numerous job opportunities because she would have to work late. She stated she was depressed, locked herself in her room for nearly two years, and pictured defendant's face every time she closed her eyes. R.H. eventually found a therapist with whom she felt comfortable and could trust and learned to manage her anxiety.

¶ 24      In mitigation, Martin Shasho testified he was defendant's brother, his family fled Iraq as

refugees, and was "inseparable," and he "looked up to [defendant] a lot."[3] Martin stated his family was involved with the church, and visited defendant on a weekly basis when he was in custody. Defendant's incarceration had a "huge" negative impact on the family. Defendant was a father figure, and his money paid for Martin's undergraduate and graduate education. Martin stated defendant was a "loving person" and the incident has "mistreated his reputation."

¶ 25    Maureen Dakhoul testified she was defendant's aunt. When defendant's father passed away, she helped bring the family to the United States as refugees in 1997. Dakhoul had a good relationship with her nephews, especially defendant, whom she had never seen "with a knife in his hand" or steal money from anyone. She testified defendant worked hard to make a better life for his family, and was never abusive in any way.

¶ 26    Michael Rolfes testified he was employed by Park Community Church and knew defendant as a congregant who was "[g]regarious" and well-liked by the community. He had a positive impact on the church, volunteered with the youth ministry, and assisted in childcare.

¶ 27    Defendant testified he attended church at Park Community Church, and had been a member for about two and a half years. He volunteered with preschoolers, teaching them basic Bible studies. Defendant had an excellent relationship with his family. He worked and saved, and "took care of every single need" his brother had, including tuition. Defendant loved his mother, but disagreed with things she did in the community. She stole "so much money" from him, and he "brought it out" on R.H. He thanked God he did not hurt R.H., "not even a scratch."

¶ 28    Defendant stated one of the biggest impacts in his life was being a part of the church. He

---

[3] As defendant and his brother Martin Shasho share the same last name, we will refer to his brother by his first name.

continued studying the Bible during his incarceration. Asked whether he has remorse, defendant stated he felt "heartbroken" that he "disturbed [R.H.]'s life" and that his own life had been disturbed. If he could give R.H. a "big, brotherly hug," he would.

¶ 29    On cross-examination, defendant acknowledged he told the probation officer recording the PSI that he "paid [his] debt." He told the officer his mother had stolen money from him, and that he blamed his state of mind at the time of the offense on the incident with his mother. Defendant interjected that he "always" forgave his mother, and that "[t]he detective lied."

¶ 30    In aggravation, the State recited the trial evidence in detail. It argued the court heard R.H.'s testimony of the incident, and it was possible the aggravated criminal sexual assault could have gone further had the neighbors had not heard R.H. screaming. The State emphasized that defendant showed one side of himself to his family and church and another side "out there." It argued defendant was a "dangerous man" who refused to take responsibility for the attack that changed R.H.'s life forever. Arguing defendant was a danger to the community, would not take "no" from anyone, and twisted the truth, the State requested a sentence of at least 20 years for aggravated criminal sexual assault, with an additional two to five years for attempt robbery.

¶ 31    In mitigation, defense counsel argued defendant came from a "hard background" and supported his family, emotionally, spiritually, and financially. He had taken responsibility for raising his brother and other siblings, helped pay his brother's tuition, and was a father figure to his brother. His incarceration had a big impact on his family, although he continued to provide them emotional support. Defendant was involved with the church and employees there know him to be very generous and well liked. Counsel argued defendant's statement to the probation officer that he "paid [his] debt" was his taking responsibility. Similarly, his testimony at the sentencing

hearing showed he had taken responsibility and shown remorse for his actions. Noting defendant's lack of a criminal background, counsel asked for the minimum sentences.

¶ 32    Defendant stated in allocution that "women in the cab industry * * * make false claims about cab drivers to get lawsuits," and he only had "two interactions" with women. He discussed the two prior incidents recited by Detective Heerdt, asserting Heerdt misrepresented the conversation. Defendant stated he never lied to the court and loved his family very much. His mother broke his heart but he forgave her, including for stealing money from him. Defendant stated the evidence was circumstantial. He told the court his statement that women were flirting with him and his sexual desires were "out of this world" was something he "just threw * * * out" because he did not want to be open about the heartbreak that happened in his life. He stated the "whole entire situation was just an expression of heartbreak."

¶ 33    The court sentenced defendant to concurrent 18-year terms of imprisonment on the two aggravated criminal sexual assault counts, and a consecutive 4-year term for the attempt robbery count. In ruling, the court noted it took into consideration the PSI, all factors in aggravation and mitigation, and defendant's allocution. The court did not find the minimum sentence to be appropriate because, although defendant stated he wanted to take responsibility, he did not do so. Instead, defendant was "minimizing; blaming; making excuses, and he's constantly controlling, trying to control everything, and when things don't go his way, he just makes excuses or other explanations. The court believed defendant was not remorseful and was "just basically sorry he got caught," noting all his statements were self-serving. In the PSI, defendant indicated he felt he paid his debt, but the court did not agree with that assessment.

¶ 34    The court denied defendant's motion to reconsider sentence, stating it took the sentence

very seriously and only considered the factors that were appropriate for it to consider. The court noted the seriousness of the incident and that it considered that defendant had no prior criminal history other than traffic offenses, had a job, supported his family, and put his brother through school. The court reaffirmed that it took all factors in aggravation and mitigation into consideration in determining its sentence and found the sentence was not excessive.

¶ 35    On appeal, defendant argues we should vacate one of his convictions for aggravated criminal sexual assault because both convictions were premised upon the same act of penetration, and the trial court violated the one-act, one-crime rule in sentencing him on both counts. Defendant leaves the determination regarding which sentence should be vacated to this court.

¶ 36    The State agrees that, because both of defendant's convictions for aggravated criminal sexual assault arose from the same act of sexual penetration, one of his "convictions" should be vacated. The State requests we vacate the conviction for aggravated criminal sexual assault premised on defendant's attempted robbery of R.H., which it argues is a less serious offense than the aggravated criminal sexual assault premised on defendant's acting in a manner to threaten R.H.'s life.

¶ 37    Defendant recognizes he did not raise his one-act, one-crime challenge before the trial court, and so the claim is technically forfeited. See *People v. Hillier*, 237 Ill. 2d 539, 544-45 92010). However, he seeks review under the plain error doctrine. The plain error doctrine allows a reviewing court to consider an unpreserved error if a clear and obvious error occurred and (1) the evidence is so closely balanced that the error threatened to tip the scales of justice against the defendant or (2) the error is so serious that it deprived the defendant of a fair trial and challenged the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 38    One-act, one-crime violations fall within the second prong of the plain error doctrine, because they are obvious errors so serious that they challenge the integrity of the judicial process. *People v. Coats*, 2018 IL 121926, ¶ 10. Accordingly, we will address defendant's argument under the second prong of the plain error doctrine. *Id*. ¶ 10. We must first consider whether a one-act, one-crime error occurred. *Id*. ¶ 11.

¶ 39    Under the one-act, one-crime rule, a defendant may not be convicted for multiple offenses based on precisely the same physical act. *Id*. ¶ 11. When a defendant is convicted in violation of the rule, we must vacate the sentence for the less serious offense. *People v. Artis*, 232 Ill. 2d 156, 165 (2009). Whether a violation of the rule has occurred is a question of law that is reviewed *de novo*. *People v. Smith*, 2019 IL 123901, ¶ 15.

¶ 40    In order to make this determination, we follow a two-step analysis: (1) ascertain whether the defendant's conduct consisted of a single physical act or separate acts; and (2) if the defendant committed multiple acts, ascertain whether any of the offenses are lesser-included offenses. *Coats*, 2018 IL 121926, ¶ 12. If none are lesser-included offenses, multiple convictions are proper. *Id*. "[T]he definition of an 'act' for purposes of this analysis is simply 'any overt or outward manifestation which will support a different offense.' " *Smith*, 2019 IL 123901, ¶ 18 (quoting *People v. King*, 66 Ill. 2d 551, 566 (1977)). "[A] person can be guilty of two offenses when a common act is (1) part of both offenses or (2) part of one offense and the only act of the other offense." *Id*.

¶ 41    We agree with the parties that one of the aggravated criminal sexual assault convictions cannot stand. A person commits aggravated criminal sexual assault when he commits criminal sexual assault and an aggravating factor exists. 720 ILCS 5/11-1.30(a) (West 2012). A person

commits criminal sexual assault when he commits an act of sexual penetration and, as charged here, uses force or threat of force. 720 ILCS 5/11-1.20(a)(1) (West 2012). Here, both aggravated criminal sexual assault counts were premised on precisely the same physical act: defendant's sexual penetration of R.H.'s vagina with his fingers. The State did not differentiate between two different acts of sexual penetration and, indeed, R.H. testified to only one act of sexual penetration. The only difference between the two aggravated criminal sexual assault counts was the aggravating factor: threatening the victim's life (count 2) and committing the sexual assault during the course of another felony (armed robbery) (count 3). Neither count involved an additional physical act not required for the other. See *Smith*, 2019 IL 123901, ¶ 19 (discussing when multiple convictions are proper). It is well settled that "[m]ultiple convictions for aggravated criminal sexual assault based on one act of sexual penetration cannot stand because of the one-act-one-crime rule." *People v. Riley*, 219 Ill. App. 3d 482, 493 (1991); *People v. Segara*, 126 Ill. 2d 70, 77 (1988) (finding six of eight aggravated criminal sexual assault convictions were properly vacated where the defendant committed only two acts of criminal sexual assault: vaginal and oral penetration). Although the legislature intended that "each act of rape, however committed, is punished," it did not intend that a defendant "receive several convictions for each act." *Segara*, 126 Ill. 2d at 77-78.

¶ 42    As defendant was convicted in violation of the one-act, one-crime rule, we must vacate the sentence for the less serious offense. *Artis*, 232 Ill. 2d at 165. However, despite the State's contention to the contrary, we cannot determine which of the two aggravated criminal assault convictions is the more serious offense. The Illinois supreme court has directed that a reviewing court may not use the aggravating factors to determine the more serious conviction among multiple convictions of aggravated criminal sexual assault. *Id.* at 171-172 ("[W]here there are multiple

convictions for aggravated criminal sexual assault based upon the same physical act, none of the offenses are more serious than any other * * * because none of the offenses involve a more culpable or less culpable state"); *People v. Garcia*, 179 Ill. 2d 55, 71-72 (1997) (remanding the case to the trial court to determine which of the defendants' convictions for aggravated criminal sexual assault based on the same act of penetration should have sentences entered upon them and which should be vacated). Accordingly, we remand to the trial court so that it may determine on which count of aggravated criminal sexual assault defendant should be sentenced.

¶ 43    Defendant further argues that we should reduce his sentence for aggravated criminal sexual assault to the minimum or close to the minimum because the trial court "ignored" the mitigating factors, including that this was defendant's first offense and he worked to support his family.

¶ 44    A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I § 11*; People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48. Under Illinois Supreme Court Rule 615(b)(4), a reviewing court may reduce the sentence imposed on a defendant by the trial court. See *People v. Lashley*, 2016 IL App (1st) 133401, ¶ 74 (reducing defendant's sentence without remanding to the trial court). "That power, however, should be exercised 'cautiously and sparingly.' " *People v. Alexander*, 239 Ill. 2d 205, 212 (2010) (quoting *People v. O'Neal*, 125 Ill. 2d 291, 300 (1988)). Accordingly, a trial court's sentencing decision is reviewed under the abuse of discretion standard of review. *Id.*

¶ 45    A reviewing court will find the trial court abused its discretion where the sentence is " 'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.' " *Id.* (quoting *People v. Stacey*, 193 Ill. 2d 203, 210 (2000)). A trial court has broad discretion in imposing a sentence, and its sentencing decisions are afforded great

deference, because the trial judge "observed the defendant and the proceedings," and is in a better position to weigh factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. The reviewing court " 'must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently.' " *Id.* at 213 (quoting *Stacey*, 193 Ill. 2d at 209). Still, we must interpret sentencing laws "in accord with common sense and reason" and not merely rubber stamp the trial court's judgment, so as to "avoid an absurd or unduly harsh sentence." *People v. Allen*, 2017 IL App (1st) 151540, ¶ 1.

¶ 46    A sentence that falls within the statutory range is presumed to be proper. *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In this case, defendant was convicted of two counts of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(3), (4) (West 2012)), both Class X felonies with a sentencing range of 6 to 30 years' imprisonment.[4] 720 ILCS 5/11-1.30(d)(1) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). Defendant's concurrent 18-year sentences fall within these statutory guidelines and are, therefore, presumed to be proper. *Knox*, 2014 IL App. (1st) 120349, ¶ 46.

¶ 47    Although defendant's aggravated criminal sexual assault sentence falls within the statutory range, he argues the trial court abused its discretion in sentencing him to 18 years' imprisonment. He cites the mitigation evidence that this was his first offense besides two traffic violations, he worked to support his family while attending school, he fled religious persecution, and witnesses testified to his devotion to his family, community, and church. He also points out he expressed remorse that he took his frustration about his mother taking his money out on R.H. Defendant argues that, given these numerous factors in mitigation, he did "not deserve" a sentence 12 years

---

[4] Defendant was also convicted of attempt robbery but does not challenge that sentence on appeal.

above the minimum.

¶ 48    The record shows defense counsel made the same arguments to the trial court at sentencing. Further, the PSI reflected defendant's lack of a criminal background, his difficult upbringing, and his work to support his family, and witnesses testified to his love and support of his church and family. As these mitigating factors were presented to the trial court, it is presumed to have considered them (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48), and defendant "must make an affirmative showing that the sentencing court did not consider relevant factors" (*People v. Burton*, 2015 IL App (1st) 131600, ¶ 38).

¶ 49    Defendant has made no such showing. The trial court has no obligation to recite and assign a value to each factor (*People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011)), and defendant points to nothing in the record that affirmatively shows the court did not properly consider the mitigating evidence. In fact, the record shows the trial court did consider the mitigating evidence. The court specifically stated that it listened to the testimony and argument in aggravation and mitigation, read the PSI, considered "all" statutory factors in aggravation and mitigation, and heard defendant's statement in allocution. The court then stated the minimum sentence was not appropriate, finding it "very clear" that defendant never took responsibility for his actions, was not remorseful, and was "basically sorry he got caught." The court specifically noted that, in his PSI, defendant indicated he felt he "paid his debt," an assessment the court did not agree with.

¶ 50    Subsequently, in ruling on defendant's motion to reconsider sentence, the court emphasized that it took all aggravation and mitigation factors into consideration in determining defendant's sentence but noted the "very serious" nature of the offense. See *Kelly*, 2015 IL App (1st) 132782, ¶ 94 (" 'The seriousness of the crime is the most important factor in determining an appropriate

sentence, not the presence of mitigating factors such as the lack of a prior record.' ") (quoting *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)). The court stated it considered defendant's lack of prior criminal history other than traffic offenses, and that he worked to support his family and put his brother through school, thus, specifically referencing the mitigating evidence defendant raises here.

¶ 51    In sum, defendant has not made any affirmative showing that the trial court did not properly consider the mitigating evidence in sentencing him. His argument is merely a request that this court reweigh the factors in aggravation and mitigation and substitute its judgment for that of the trial court. This we cannot do. *Alexander*, 239 Ill. 2d at 213 (where the sentencing court adequately considered the appropriate factors, "the reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed those factors differently"). The trial court did not abuse its discretion in imposing an 18-year sentence for aggravated criminal sexual assault where it properly considered the mitigating evidence.

¶ 52    Lastly, in his opening brief, defendant contends certain fines and fees the trial court assessed against him should be vacated or offset by *per diem* monetary credit. However, in his reply brief, defendant agrees with the State that, because he failed to raise these claims in the trial court, the issue should be remanded to the trial court under Illinois Supreme Court Rule 472(e). We agree. Pursuant to Illinois Supreme Court Rule 472(e), we "remand to the circuit court to allow [defendant] to file a motion pursuant to this rule," raising the alleged errors in the fines, fess, and costs. Ill. S. Ct. R. 472(a)(1), (a)(2), (e) (eff. May 17, 2019); *People v. Johnson*, 2020 IL App (1st) 162332, ¶ 98.

¶ 53    For the foregoing reasons, we remand the cause to the trial court for a determination as to

which aggravated criminal sexual assault sentence will be retained and to allow defendant to file a motion under Rule 472 if he so chooses. The trial court is affirmed in all other respects.

¶ 54    Affirmed in part; cause remanded with directions.